**LEVER BROS. CO. v. PROCTER & GAMBLE MFG. CO. et al.**
Civil Action No. 1058.

District Court, D. Maryland.
March 6, 1943.

See, also, D.C., 38 F.Supp. 680.

Edgar Allan Poe, Sr. (of Bartlett, Poe & Claggett), of Baltimore, Md., William H. Davis, John Hoxie, and Roger T. McLean (of Pennie, Davis, Marvin & Edmonds), and William D. Mitchell (of Mitchell, Taylor, Capron & Marsh), all of New York City, Walter J. Blenko (of Stebbins & Blenko), of Pittsburgh, Pa., Worthington Campbell, Eben M. Graves, and Mark Donohue (of Hoguet, Neary & Campbell), all of New York City, J. Mack Swigert (of Taft, Stettinius & Hollister), of Cincinnati, Ohio, and Floyd S. Davis, of Cambridge, Mass., for plaintiff.

Frank B. Ober (of Ritchie, Janney, Ober & Williams), of Baltimore, Md., Drury W. Cooper (of Cooper, Kerr & Dunham), of New York City, Marston Allen and E. S. Allen (of Allen & Allen), both of Cincinnati, Ohio, Francis G. Cole (of Watson, Cole, Grindell & Watson), of Washington, D. C., and Louis Quarles and David A. Fox (of Lines, Spooner & Quarles), both of Milwaukee. Wis., for defendants.

CHESNUT, District Judge.

This case presents a suit for infringement of a patent in the usual form. And the defenses are also the usual ones of in-

validity of the patent and non-infringement. Separate findings of fact and conclusions of law have been made in accordance with rule 52 of the new rules of civil procedure, 28 U.S.C.A. following section 723c; but it is hoped this opinion will be sufficiently self-explanatory. The trial of the case occupied three full weeks, the stenographic record is about 3,000 pages, and the exhibits number about 150. It is accordingly impossible in an opinion of any reasonable length to deal in detail with the whole of the testimony in the case. An effort will therefore be made to simplify the discussion as far as possible and to limit it to the controlling points of the case.

I start with an analysis of the patent in suit which is of course the controlling document. The patent is United States Patent No. 2,215,539, issued to John W. Bodman on September 24, 1940 as a continuation of application filed April 8, 1933, which was largely amended or rewritten in 1936 and further largely amended shortly before the issuance of the patent in 1940. The patent has been assigned to Lever Brothers Company, a Maine corporation, of which Bodman, the patentee, is director of the research department. Lever Brothers Company is the plaintiff in this case and the defendants are the Procter & Gamble Companies, the alleged infringers by virtue of the manufacture and sale of their "New Ivory Soap." The plaintiff and the defendants are the largest manufacturers and sellers of soap in the United States.

The patent relates to an improvement in the manufacture of soap. In general terms the specifications in the patent make a sharp distinction between "framed" soaps on the one hand, and "milled" soaps on the other. The advantages and disadvantages of each type of soap are pointed out, and it is said that the general purpose of the invention is to make a new kind of soap which will possess many of the advantages of both milled and framed soaps but without their disadvantages or defects. What is particularly stressed as a desirable objective is to make a soap having "the firmness and fine grain or texture of the best milled soaps"; and on the other hand to also possess the advantage of some framed soaps which are *floating* soaps. It is also said that floating framed soaps have a texture that is not as fine or close grained as that of high grade milled soaps and therefore are not considered as high grade

toilet soaps. Another disadvantage of the framed soap is that it contains, when cut into bars for use, substantially the same amount of water as kettle soap, namely about 30%, which begins to evaporate immediately the soap is wrapped and sent to storage or put on the market; and on drying out the framed soaps therefore tend to warp and twist, the degree of deformation depending particularly on the size and shape of the bars or cakes. This disadvantage makes most framed soaps unsuitable for toilet purposes. But as framed soaps can be produced relatively cheaply they have heretofore supplied a demand which could not be met by other soaps.

In contrast to the framed soaps, milled soaps have a solid compact or dense structure and are of fine texture, do not warp easily and better retain their incorporated perfumes. Their more compacted soap mass in the milling and plodding process by which they are made, also eliminates any air present in them and gives a non-floating soap. This non-floating feature is said to be a disadvantage of the milled soap, and the patentee states that "numerous efforts heretofore made to produce a floating milled soap have not been successful. Another disadvantage of milled soaps is pointed out in that they have a tendency toward disintegration due to the fact that milled soap is made up of a plurality of pellets compressed together forming an agglomeration rather than a continuous unitary mass; with the result that the segmentation in the mass tends to laminations or cleavage planes within the bar or cake of soap into which water enters along the crevices, laminations or planes, and results in internal swellings tending to force portions of the bar to rapid disintegration."

The patentee states that his process for the manufacture of *a new kind* of soap will produce a "new floating soap of novel structure and other characteristics more nearly resembling a milled soap than a framed soap, in that it may possess some characteristics similar to those of fine texture milled soaps, such as firmness, fine grain or texture, smooth 'feel' to the fingers, and ability to retain the more volatile perfumes, and does not warp on ageing or drying. Unlike milled soap it floats, and furthermore may be distinguished from milled soap in having a continuous body and the uniform dispersion of fine voids

throughout the mass thus resembling the fresh smooth surface of meerschaum."

However, the patentee points out that his new type of soap is not made in the way that milled soaps are made, that is by compacting fragments of soap into a self-sustaining agglomerate mass while they are in a softened condition, the operation taking place at room temperature although the effect of the plodder in amalgamating the soap fragments slightly raises the temperature of the soap mass. In contrast to the latter method of making milled soap the patentee describes his new process as follows: "the soap stock, preferably in solidified form in fragments or pellets, is reduced to a heated plastic or semi-fluid condition while it is intensely agitated or worked in the presence of air and under pressure in a chamber closed to the atmosphere. There results an aerated unitary, continuous mass of soap, as distinguished from the compacted agglomerate mass characteristic of milled soap. The intense agitation or working of the soap stock in the enclosed chamber in the present process is performed on a plasticized or semi-fluid soap stock under working pressure."

The patentee says that the result of his new process is "to produce a very desirable improved soap which wears longer in use than either framed or milled soap, and yet which lathers freely for any purposes for which it is used. The penetrated layer of the improved soap when left in contact with water is not as soft as the penetrated layer of milled or framed soap as heretofore produced. If left immersed in water it does not swell in the manner in which both framed and milled soaps swell when lying in water for any considerable time and when dried does not shrink. When immersed in water only a relatively thin surface layer of this new soap becomes slightly softened. This is because the water does not penetrate as far into this soap, for example, in a given period of time as it does into comparative framed and milled soaps, and because the new soap does not absorb as much water as framed and milled soaps. Furthermore, the new process imparts to the soap a texture which is continuous and unitary and free from laminations or cleavage planes extending into the body of the soap such as are formed in milled soap by compression of the pellets or pencil-like bodies from which milled soap has heretofore been made and along which water can travel and cause swelling and disintegration. As a result of these improved qualities a soap can be produced by the new process which gives off only the requisite quantity of lather when rubbed between the hands or on the wash, and does not become noticeably or undesirably soft and slimy at its point of contact with the washstand or a flat receptacle. The patentee also says that the detergent or cleansing properties of the new soap are brought into use more economically and under better control than in the former kinds of bar or cake soap. Again the patentee points out that the soaps for toilet or other domestic use must not be undesirably soft and must not absorb too great a proportion of water and become so soft or slimy as to be unusable. To such objections it has heretofore been necessary to use a relatively large proportion of high titre fatty acids in making up the soap process; but such high titre fatty acids (palmetic, stearic, lauric acids) must not be too great in proportion as otherwise the soap will be too hard and not sufficiently free lathering. But by means of the new process, which controls the hardness and the lathering qualities of the soap, it is possible to use a much larger proportion of the salts of low titre fatty acids and so produce "a free lathering but hard soap"; and it is added that by use of the new process the percentage of the fatty acids which give the oleate and linoleate salts may be increased to substantially 75% and yet the resultant soap will be *harder and longer wearing* than milled soap has heretofore produced." (Italics supplied)

It will thus be seen that the objective of the patent was to produce a new type of soap which would bring together in one bar the desirable quality of framed soap in that it would float; but avoid the disadvantage of framed soaps in the tendency of large bars to warp; and would likewise have the good quality of milled soap with respect to its *hardness, firmness* and fine texture; but would be better than milled soaps in that (1) the new soap would float; (2) would lather sufficient for reasonable use; (3) but would be better than milled soaps in that it would (a) more strongly resist water penetration; (b) would not so readily "slime" in use; (c) would not have "specks" in the soap bar and (d) would not swell nor tend to disintegrate by virtue of water penetration into the fissures, crevices or laminations incident to the mere agglomeration of pellets of soap into the completed bar of milled soap. It is important to note how-

ever that the patent claims in this case do not specify the avoidance of these just enumerated disadvantages of the milled soaps.

We next turn to the patent specifications to learn the teaching of the patent as to the process by which the new type of soap was to be obtained. Very briefly stated, the process is to take a soap stock containing not more than 25% of water and to reduce it by heat to a "plastic or semi-fluid condition while it is agitated or worked in the presence of air and under pressure in a chamber closed to the atmosphere". It will be noted that here the specification does not state the temperature, or the amount of pressure required to reduce the soap mass to a plastic condition; but elsewhere in the specifications it is stated that the temperature range in the process is from about 160 degrees F. to about 225 degrees F., and the pressure may be anything from 25 to 100 pounds per square inch. However, the patentee did not wish to limit himself absolutely to the specified temperatures as he says they would be modified, dependent upon the detergent components used, that is, the chemical composition of the soap mass, and the moisture content and the presence of other ingredients. *It will be noted, however, that nowhere in the patent are particular temperatures or pressures specified for any desired kind or quality of the final soap product, with respect to degrees of hardness or softness, or latherability.*

The general description of the process which has been just above stated makes it necessary to study the specifications and evidence to ascertain the more precise meaning of some of the language used in describing the process, particularly what is meant by the term "plastic or semi-fluid", and what is meant by "pressure" and by "a chamber closed to the atmosphere". The specifications do not precisely indicate what degree of plasticity is intended by the phrase "plastic and semi-fluid condition"; but the evidence in the case shows that this means the condition of the soap which is characteristic of what is called "neat or kettle soap" which results from the whole boiling process. The specifications do indicate that the purpose of reducing the soap mass to a plastic or semi-fluid condition is that it will thus resist the pressure of the agitating means, but can be thoroughly worked and mixed. The specifications indicate that the purpose or function of the pressure is to compress the soap mass so that it will more stoutly resist agitation and consequent mixing, and thus cause it to be more thoroughly worked and mixed with air, so that it will become a continuous mass in which the air is uniformly distributed throughout the mass, and the resultant continuity of the mass will be different from milled soap which is an agglomeration of small particles of soap rather than a continuous mass. The specifications recommend 25 pounds per square inch of pressure and also indicate generally that there should be a variation of pressure correlated to temperature, the pressure being increased with a rise in temperature; and the temperature itself to be varied according to the degree of wear, water absorption or water penetration desired in the soap. The purpose of closing the chamber in which the mixing takes place, from the outside atmosphere, is to prevent the escape of the air entrapped in the soap mass while it is being worked under pressure. It is also pointed out that in framed floating soaps as previously produced, the entrapped air bubbles are relatively large and irregularly distributed throughout the body of the soap; but in distinction therefrom the result of the new process is that the entrapped air bubbles are relatively small and are uniformly distributed throughout the body of the soap; and are so small and evenly distributed that when the final bar is broken open these air cells are not noticeable to the unaided eye, and the texture of the soap is thus finer than that of the finest milled soap.

The patentee does not limit himself to any particular kind of mechanical means for carrying out the process. He points out that the result can be accomplished by many different kinds of mechanical agitation as for example, by a shearing and infolding action, and by any suitable kneading or working of the soap mass. What is required is a thorough working or agitation so that all portions of the soap mass will be moved relatively to each other and be exposed equally to the source of heat. The patent contains a drawing of a Banbury mixer which is a well-known machine described in the patent to Banbury No. 1,200,070, dated October 3, 1916; and the specifications illustrate in detail how the process can be carried out in that machine. Simply stated the machine consists of two large chambers with a large opening from one to the other so that the body of the chamber roughly represents the figure 8,

each chamber equipped with a rotor and both chambers jacketed for the introduction of steam or other heating medium. Emerging from the upper portion of the jacketed chambers is a comparatively narrow bottle-neck, and above that in a vertical cylinder is a heavy plunger which can be lowered into the bottle-neck thus closing the chamber, and the weight or pressure of the plunger upon the soap plus additional steam pressure if desired, affords the compressing action on the soap which has been referred to. In the example given, small pellets of ordinary milled soap (which usually have a water content of about 15%) are poured into the chambers of the Banbury mixer, the plunger is then let down into the bottle-neck, and the rotors started for agitating and working the soap mass, which is heated to the requisite temperature through the jacket. After 15 or 20 minutes operation the soap mass is ready to be released through a gate at the bottom of the chambers, and then can be drawn off into forms and upon cooling is ready to be cut into bars of the desired size.

The patentee asserts that the result of carrying out the process either in a Banbury mixer or other machine having similar operating conditions, converts the soap stock into "a different kind of soap product". And it is said that the detergent or cleansing properties of the soap ingredients remain substantially unaffected by the heat and agitation treatment, and that the new soap resulting is more economical in use, and also the process gives the soap maker a better control of the particular kind of soap that he desires to make. The patentee thinks that the desired result may be attributable to the "continuity" of the soap mass as distinguished from the different structure of milled soap.

■ We turn now to the claims of the patent which, of course, mark the limits of the patent grant. Milcor Steel Co. v. Fuller Co., 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332. We find that there are 20 claims, of which the first 10 are for the process and the remainder for the product. In this case the plaintiff is content to rest the decision upon claims 5 and 7 for the process and the related product claims, 13 and 20. These claims are as follows:

5. "The process of producing a floating soap having a continuous aerated mass with a uniform dispersion of fine voids throughout, and a characteristic texture and firmness similar to milled soaps and shape-stability, comprising introducing a soap mass containing about 5 to 25% moisture into a closed mixing chamber, working said mass in the presence of air while heating at a temperature of from about 160 degrees F. to about 225 degrees F. to uniformly distribute air throughout said heated mass, maintaining sufficient pressure on said mass to retain the air therein, releasing said mass to cause it to solidify in a continuous and aerated state."

7. "The process of producing a floating soap having a continuous aerated mass with a uniform dispersion of fine voids throughout and a characteristic texture and firmness similar to milled soap and shape-stability, comprising introducing a soap mass containing less than about 25% moisture into a closed mixing chamber, working said mass under pressure in the presence of air and while in a plastic or semi-fluid condition to uniformly distribute air throughout said mass, and forming the mass into bars or cakes."

13. "A floating soap, having a characteristic texture and firmness similar to milled soaps and shape-stability, said floating soap having a moisture content of less than about 25% and having a compatible gas finely disseminated through it in sufficient quantity to make it float, said floating soap resulting from the cooling of a plastic or semi-fluid soap mass containing less than about 25% of moisture subjected, in the presence of the gas, and under pressure, to mechanical agitation to disseminate under pressure the gas through the mass at a temperature sufficiently high to render it at least plastic or semi-fluid."

20. "A floating soap having a uniform dispersion of fine voids throughout its mass, and a characteristic texture and firmness similar to milled soaps and shape-stability, with a moisture content of less than about twenty-five percent, said floating soap resulting from working in a closed mixing chamber, a continuous soap mass containing about 5 to 25% moisture in the presence of a compatible gas under pressure, while the mass is heated to a temperature of from about 160 degrees F. to about 225 degrees F., and then releasing the mass to cause it to solidify in a continuous and aerated state."

It will be noted that claims 5 and 7 are substantially the same in wording with the exception that claim 5 specifies the requisite temperature for the heating of the soap

mass while this specific requirement is omitted in claim 7. Likewise, with respect to the two product claims, the temperature is specified in claim 20 and not in claim 13. Analysis of claim 5 shows that the process consists of the following elements:

1 Introducing a soap mass of 5 to 25% moisture

2 into a closed mixing chamber

3 working said mass in the presence of air

4 while heating at a temperature of from about 160 degrees F. to about 225 degrees F.

5 to uniformly distribute air throughout said heated mass

6 maintaining sufficient pressure on said mass to retain the air therein

7 releasing said mass to cause it to solidify in a continuous and aerated state. Thus producing

1 a floating soap

2 having a continuous aerated mass

3 with a uniform dispersion of fine voids throughout and

4 characteristic texture and firmness similar to milled soaps

5 and shape-stability.

To be valid a patent must conform to the statutory conditions on which the monopoly grant is made. These constitute the principal and most important objective tests for the validity of the patent. The statutes are 35 U.S.C.A. §§ 31 and 33. They require that the invention or discovery must be "new and useful"; and the written application for the patent must describe the invention or discovery "and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; * * * and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." The necessity for compliance with this statutory requirement has been recently emphasized and applied by the Supreme Court of the United States in United Carbon Co. v. Binney & Smith Co., Dec. 7, 1942, 63 S.Ct. 165, 87 L.Ed. ——.

In considering the validity or construction of the patent claims it is important to first determine as a fact what was the discovery made by Bodman that was new. The answer to this will greatly simplify consideration of many of the less important controversial matters in the case.

Bodman was the director of the research department of Lever Brothers, the plaintiff. Its leading soap product was "Lifebuoy", a milled soap with an artificial reddish color. It had a very large sale, but there were some objections to it in that it was one of the softest of standard makes of milled soaps and in consequence was more readily permeable by water and had a strong tendency to slime in use. The effect was to discolor the water in which it was used and this was called the "bleeding" of the soap. Bodman experimented to minimize this objectionable feature. He had the idea that, if the soap stock reduced to solid milled pellets dried to a moisture percentage of about 15%, could be more thoroughly agitated and ground up than was possible in the ordinary plodding process for the formation of milled soap, the objection might at least be partially overcome. It occurred to him to use for this purpose a more powerful agitating means than in customary use for the plodding of milled soap pellets into the soap mass from which the bars would ultimately be cut; and he decided to use the Banbury mixer which has been described, and which theretofore had been principally used in the manufacture of rubber. At first he did not try to heat the soap in the Banbury mixer. But, as a result of one of the experiments he noticed that a part of the soap mass, on release from the Banbury mixer, had an unusually white color and it occurred to him that possibly it might float and he found that some of it did float. This seemed important to him because Lever Brothers had long been desirous of making a floating white soap which would be better than the defendants' well-known soap product widely and popularly known and sold under the name of "Ivory". The latter was a framed soap made by the boiling process and had been widely advertised under the slogan "It Floats". Bodman thought that possibly the floating quality of some of the soap product resulting from his experiments, was due to the heated condition resulting from the friction of the powerful agitating screws in the Banbury mixer whereby some of the soap mass had become molten and in a plastic or semi-liquid state; but, as only

some portion of the particular batch had this condition, it further occurred to him that if all of a particular batch could be uniformly heated to the requisite temperature during the agitation, all of it might have the resultant ·floating quality. He thereupon had conducted numerous further experiments during which the soap mass in the Banbury was subjected to various degrees of heat applied in the surrounding jacket of the machine. As a result of many experiments at varying temperatures, he found that, if the temperatures were high enough there would result a soap product that had the following characteristics: (1) It would float; (2) would be hard and firm like milled soaps; (3) would not warp; (4) would not readily slime on reaction to water and (5) the bar of soap in use did not have the tendency to disintegrate that was characteristic of milled soaps by virtue of the cleavage planes, laminations or fissures in the soap mass. Bodman concluded that by this particular manufacturing process he had found a way to make a new type of soap differing from the former framed and milled soaps, and which would have beneficial qualities superior to the defendants' old Ivory and could therefore successfully compete with it if not supplant it in the market for ordinary domestic use.

It is important to note that Bodman thought that he had succeeded in producing *a new and different* kind of soap; and he so definitely and clearly stated in · his patent application filed in 1933, and this statement was continued in subsequent amendments of the patent application, when filed as a continuation application in 1936 and also in further amendments made in 1940, two months after the defendants' product of New Ivory, now claimed to be an infringement, was on the market and had come to the plaintiff's attention.

Why did Bodman consider his new soap product a distinctively new type of soap in distinction from framed or milled soaps? The answer to this question is also important in considering the validity or scope of his patent. The answer will not be found in the patent specifications and claims as finally issued in 1940. But it is very clearly stated by Bodman himself in the 1933 and the 1936 specifications. He there points out that his understanding of the matter is that the intensive working of the soap in a plastic condition, caused by sufficiently high extraneously created temperature uniformly and continuously applied, resulted in a *physical change* in the arrangement among themselves of the tiny separate soap crystals constituting the mass of the soap. He describes this more particularly as follows: He points out that the soap stock is produced by the *chemical* combination of fatty acids and alkalis, and therefore usually contains as its major ingredients the sodium salts of *oleic,* palmitic and stearic acids in substantially the following proportions: sodium oleate 55%; sodium palmitic 25% and sodium stearate 20%; and that the ordinary effect of a larger proportion of sodium *oleate* in the soap results in a comparatively *softer* soap and a larger proportion of *stearate* causes a *harder* soap with greater wearing qualities. He then says: "Various theories have been advanced to account for the swelling of soap when left immersed in water, and for the undesirable and objectionable softening of the surface of the bar or cake left in contact with a wet surface. My conclusion based on numerous investigations and experiments is that these results are due principally to two factors: 1, the relative capacities of the soap crystals for absorbing water, or in other words, their relative absolute gelation capacity; and 2, the arrangement of the soap crystals in the bar or cake. * * * The sodium palmetic and sodium stearate crystals are, at the usual washing temperature, comparatively insoluble, whereas the sodium oleate crystals readily soak water and jell or quickly go into solution in the presence of sufficient amounts of water. In the framed and milled soaps as produced by the present commercial processes the various kinds of sodium fatty acid crystals uniformly arranged and distributed throughout the soap mass, that is to say, the relative quantity and arrangement of the oleate, palmitic and stearate crystals in each unit volume of the soap mass, are substantially the same as in every other unit volume of the soap mass and the crystals according to their relative quantities are uniformly distributed." He then says that—"the· inference is that in the cake or bar of soap ·made by former processes the oleate, palmitate and stearate crystals do not coalesce but simply more or less firmly adhere to each other by the mechanical interlocking of the crystals, the oleate crystals to a large extent surrounding and enclosing the palmitate and stearate crystals. The oleate crystals dissolve readily,

and since these are more or less uniformly distributed throughout the soap mass and between and in intimate contact with the palmitate and stearate crystals, the mixture of the three component fatty acid salts swells and softens in the penetrated layer of the cake or bar, or if the immersion is continued long enough the whole soap mass is soaked through with water and can be easily disintegrated by the fingers. As the oleate crystals absorb water they swell and push outwardly the undissolved palmitate and stearate crystals, hence the swelling of the cake or bar of soap which has been left in water for an hour or more or over night, and hence the loss of the undersurface of soap which has been in contact with the wet soap dish or wash-stand."

Bodman then explains that the result of his process is to cause a *rearrangement* among themselves of the separate crystals of the oleate soap on the one hand and the palmitic and stearate on the other and the resulting soap mass is on the whole *firmer*, more resistant to water, and the soap bars wear longer in use. He says: "The fact is that by reason of subjecting the soap stock to a sufficiently high degree of heat, under the requisite pressure, and so working or mixing the soap mass under these conditions as to subject all parts thereof quickly to the source of heat, the relation of the oleate, palmitic and stearate crystals to each other is so altered, as by the suggested rearrangement of the crystals, that when a cake or bar of soap produced by the present process is immersed in water for any given test period, the dissolving of the oleate crystals and their absorption of water does not dislodge the palmitic and stearate crystals to an appreciable or measurable extent. * * * Hence the conclusion is that the palmitic and stearate crystals of framed or milled soaps as heretofore made are only loosely bonded."

In contrast with this characteristic of framed and milled soaps Bodman points out that his process results in rearranging the separate crystals in relation to each other so that they are all more closely compacted into a continuous mass, and more closely united. He also says: "The intense agitation or working of the soap stock in the enclosed chamber may be regarded as similar to the milling operation in compacting the solidified soap fragments, but since this agitation is performed on a plasticized or semi-fluid soap stock under pressure, the two operations result in *radically different products*. Hence the difference between milled soap and the soap of the present invention is not a matter of degree but is rather a *difference in kind or species* due to a difference in mode of treatment." (Italics supplied)

It will be found on examination of the file wrapper of the patent that most or all of this theory of Bodman's as to why his new soap constituted a new and different species, has been dropped out of the patent as issued in 1940; and the rather extensive quotations from the 1933 and the 1936 patent applications were not made with any idea that as a matter of law Bodman is bound or limited by the first advanced but later abandoned expression of theory, but only to emphasize and make clear the important point that he thought he had discovered a distinctly new kind of soap as a product, and this tends to emphasize the feature of the patent with respect to the product rather than to the process.

As a matter of fact, as appears from the scientific evidence in this case, Bodman's theory of his discovery as to how and why the particular process resulted in a new type of soap was along the right line although he, and apparently his scientific advisers in the research department of Lever Brothers, did not then quite correctly understand just what had happened to the soap. We must now turn to the scientific evidence in the case to learn what this was. The scientific fact is that the agitation of the soap at a sufficiently high temperature effects a transition change in the physical "phase" of the soap. It is well known that various physical substances have these physical phase transitions due to particular conditions affecting them. The most common illustration is that of water which at different temperatures assumes different physical properties. At 33 degrees F., water is, of course, a liquid; at 32 degrees or lower it becomes a solid; and at 212 degrees it becomes a vapor. And also with regard to carbon. It exists in the form of the very hard diamond, but some times in the form of the soft graphite in lead pencils. Likewise soap, in different physical phases, has different physical properties. This fact has recently been scientifically established by means of x-ray photographs of soaps agitated at different temperatures. The temperature at which the phase transition occurs for soap made from a given formula (as to its chemical composition from par-

452

ticular ingredients) depends upon the percentage of water content. This is sometimes called the "critical" temperature of the soap. It is illustrated by defendants' Exs. Nos. 82 and 83, which show the critical temperature curve for a customary standard soap stock of 80% tallow and 20% cocoanut oil, which is the formula used by the defendants in their New Ivory alleged to be an infringement in this case. From this chart we see that the critical temperature of soap at which the phase transition change occurs shows a rising curve dependent upon the water percentage content of the soap stock. The higher the moisture content the lower the temperature at which the change occurs. Thus for a water content of 25% the critical temperature is 160 degrees F. For 20% moisture the critical temperature is about 185 degrees; and for 15% moisture the critical temperature is about 195 degrees, and for 10% moisture the critical temperature is about 230 degrees. If the water content is so low as about 5%, it is doubtful whether the phase transition occurs at all, as the soap mass is too solid and brittle to be effectively agitated.

The correctness of the scientific data in this case is not seriously challenged by the plaintiff, but its interpretation of this data is that it is unimportant when related to its construction of the patent claims which is very broadly contended for. The more important aspects of the scientific data are clearly stated in the testimony of Dr. Andrews who is the present head of the Department of Chemistry of the Johns Hopkins University. He also conducted some experiments with soap in a Banbury mixer. From his testimony and that particularly of the witness Strain, who is a chemical engineer in the research department of the defendant, and Dr. Ferguson who is the director of that department, the following facts are, I think, clearly established by the weight of the evidence in this case.

1. There is a peculiar and distinctive difference between the properties or qualities of soap agitated in a plastic state at a temperature *above* its critical temperature, as compared with similar agitation at a temperature *below* its critical temperature. Above the critical temperature the resultant soap is distinctly and characteristically a hard soap. It does not freely lather and does not readily slime. It resists water reaction. It is hard and very firm and waxy in its feel and in response to hand pressure. In this respect it is equal if not greater in firmness than the ordinary milled soap. But if the agitation of the soap mass is made at a temperature less than its critical temperature it is what is generally called a soft soap which freely lathers and readily slimes, and does not freely resist hand pressure when freshly made and ready for sale in ordinary commercial practice. The reason for this difference in the two kinds of soap is due to the phase transition change which occurs at the critical temperature. For convenience of description the phase condition which results from the higher temperature is called the "omega" phase and that which results from the lower temperature is called the "beta" phase. When we speak of the "beta" and "omega" phases we refer to the predominance of one phase to the other as causing the difference between the two kinds of soap, hard or soft.

2. The common run of milled soap formed by the old plodding process has characteristically the "beta phase" in soaps because, in the working of the soap by the plodder, it is not heated to a temperature above the critical point. It has shape-stability (non-warping) merely because it has a low water percentage. The disadvantageous feature of warping is due to a higher moisture content of about 30% in framed soaps, and in consequence exposure to the air results in evaporation of the excess moisture which causes warping. The non-floating feature of many milled soaps is due solely to the fact that they have insufficient air incorporated in the mass, and therefore their specific gravity is greater than that of water. The smooth or waxy feel of milled soaps is due to the fact that the mass is very closely compacted and pressed. But when we come to the matter of the reaction of milled soaps to water, that is their latherability, their water penetration and tendency to disintegration in use, this results from the fact that the phase condition of the soap is "beta" and not "omega". In this connection it will be remembered that it was Bodman's objective to mitigate the high degree of water penetration, sliming effects and disintegration of the bar of soap.

3. The plaintiff's present commercial product known as "White Swan" claimed to be a product of his new process, is distinctly "omega" and not "beta" soap, and has the properties pertaining to the omega

soap phase. It cannot be produced in the Banbury mixer at a temperature less than about 190 degrees. It has a 20% water content. On the chart above referred to its critical temperature is 185 degrees and that is the temperature at which it is produced in the plaintiff's production by means of the machine called the "Converter". This name is not without significance on the point immediately being discussed, that is, whether the defendants' process produced a distinctly new type or species of soap. In the specifications the process is referred to as "converting" milled soap pellets into a new kind of soap. This again shows how clearly the patentee was describing his new product in result as *converted* from an old type to a new type of soap. And this is actually what happens when the soap is agitated above the critical temperature, that is, there is then a phase transition change.

That the new kind of soap described by the patentee cannot be produced at a temperature less than 190 degrees F. with a water content of 15% (as assumed by the plaintiff in the example in the patent), is convincingly shown by other evidence in this case. In the original patent application the process was described as applicable to the making of either floating or non-floating soap. The patentee said: "A floating soap produced by the present invention may have a specific gravity of about 0.50 to 0.98 and differs most widely from framed or milled soaps with respect to wearing qualities, that is length of life in use, sliming and swelling when treated at about 220 degrees F. Satisfactory floating soaps are produced at temperatures ranging from 190 degrees F. to about 210 degrees. At temperatures above 220 degrees the soap produced begins to lose its buoyancy until at 230 degrees F. and over, the soap produced sinks in water readily." But in the patent specifications as finally issued in 1940 this statement is changed to read as follows: "Satisfactory floating soaps are produced at temperatures ranging from 160 degrees F. to about 225 degrees F. with a soap stock of the illustrative type used by way of example in this disclosure. The foregoing temperatures, of course, would be modified, depending upon the detergent components used, the moisture content and the presence of other ingredients." While the temperature range was thus changed in the final wording of the patent specifications, it is to be noted that no change was given in the illustrative example used, and we are left to conjecture why the temperature range for a satisfactory floating soap was thus altered and lowered from 190 degrees to 160 degrees without explanation, especially when we find in the evidence a report made to Mr. Bodman on March 11, 1942, by his research assistant, a Mr. B. L. Maxwell, which in effect stated that "190 degrees F. represents the lowest temperature at which it was possible to obtain a desirable texture." (See Def. Ex. No. 29) We may also note that during the progress of the patent application in the Patent Office Bodman and his assistants conducted extensive further experiments with regard to his process, and under date of January 16, 1939 he prepared a memorandum on what the plaintiff called its Converter soap, at the end of which the following conclusions (with others) were stated in summary: (1) The properties of converter soap are dependent on a unique physical structure resulting from the phase relationship or cycle of phase changes produced by the process conditions; (2) the properties of converter soap are not dependent on the air content of the soap; (3) with regard to any alteration of the solubility and lathering properties of soap when subjected to the converter process, for practical purposes, this may be adjusted by formula composition, retaining, however, the desirable converter properties of fine texture, unique air distribution, firmness, form retention and resistance to objectionable slime.

The conclusion on this branch of the case seems to be clear that Bodman's only *real discovery* was that a new kind of soap could be produced by agitation of a soap mass at a temperature which would bring about a change in the phase of the soap; and the process outlined by him was intended to result in this converted condition of the soap.

The claims involved include as an element a description of the new type of soap as "a floating soap having a continuous aerated mass with the uniform dispersion of fine voids throughout and a characteristic texture and firmness similar to milled soap and with a moisture content of less than 25%." And, as we have seen, the process includes the element of introducing the soap into a closed mixing chamber, working the mass in the presence of air while heating at a temperature of about 160 degrees F., to 225 degrees F., to

uniformly distribute air throughout the mass and maintaining sufficient pressure to retain the air therein. The patent treats 25% as the critical moisture content, which cannot be exceeded in the process, and the plaintiff stresses this as a particular feature of novelty or invention, but the evidence in the case is not impressive or convincing that this is so. It rather appears that the moisture content is important only as correlated to the temperature at which the phase transition occurs, that is, the higher the moisture content, the lower the requisite temperature.

We now turn to the prior art to ascertain to what extent the product and the process are new in the art of soap making. In short summary of this and without discussion in detail it may be said that the prior art does not clearly show any full anticipation either in literature, patents or uses of the particular discovery by Bodman. But it does show that there was no novelty in the method or process used by Bodman in making the discovery. Thus it was not new to powerfully and intensely agitate a soap mass containing less than 25% of moisture in a mixing chamber when open or closed, and to produce there either milled or framed soap as a floating soap. Nor was it new to make a soap with minute air bubbles (fine voids) throughout; and of course in the art of soap making there were many instances in which soap was heated to high temperatures. The well-known Doppcrutcher was a machine equipped with an Archimedean screw and a jacketed chamber in which soap stocks were commonly intensely agitated and mixed at high temperatures. In operation it was quite like a Banbury mixer, except for the plunger and pressure. Counsel for the plaintiff contend that in most, if not all, of the instances in which soap of less than 25% water content was used in the process of manufacture, the soap also contained a percentage of glycerine which added to the water content would bring the amount above 25% moisture and therefore contend that the patent specifications in referring to a moisture content include glycerine as well as water on the theory that glycerine had a similar effect to water in the operation. But the patent says nothing about glycerine in connection with moisture content, and it is sufficiently clear in the prior art and uses that there were instances of working soap under 25% moisture including glycerine. The Col-

gate process of making the well-known Colgate Shaving Stick, so popular some years ago, involved a water plus glycerine content of only about 11%. In appearance the extruded bar of Colgate soap was soft and plastic and malleable, expanded when released to the air, and had a very distinct white appearance, and also some of the product floated, although there was no occasion to make the soap in the shaving stick a floating soap. The weight of the evidence fails to show that glycerine functions like water in this connection. I conclude on this point that the moisture content as referred to in the patent means the water content.

With reference to the literature of the former art, there is a succint paragraph in the standard text book on Toilet and Shaving Soaps entitled "Industrial Chemistry of the Fats and Waxes" by P. D. Hilditch, published in 1927 by Van Nostrand, New York, which, though not comprehensive as to the prior art, conveniently summarizes much that is material in this case. In dealing with the subject of toilet and shaving soaps and under the paragraph caption of "Floating and Marine Soaps" on page 317, the author says: "In order to produce a soap which will float on the surface of water, a cold-process soap, or a *milled and plodded soap may be violently agitated* or injected with air after being brought into a warm pasty condition and then allowed to cool and set in moulds. The solidified soap retains the air in the form of enclosed *minute bubbles* and the specific gravity of the whole is less than that of water, the product being sold as *floating soap.*" (Italics supplied) In this context there was evidence in the case that the word "pasty" means "plastic" and the word "warm" obviously refers to temperature although the degree is not stated. Apart from the elements of specific temperature and pressure which are stated features of the Bodman process, this quotation shows that it was old in the art to make a milled floating soap by means of violent agitation in the presence of air while the soap was in a plastic condition, and resulting also in the mass retaining the air in the form of enclosed minute bubbles.

In the specifications of the patent as issued Bodman summarized the important elements of his process as intense agitation of the soap while heated to a plastic or semi-fluid condition under pressure in the presence of air in a chamber closed to

the atmosphere. The only element of this process that was not practiced in the former art is apparently that of pressure, and possibly the closed chamber. The requisite temperature is not here stated other than that the mass must be heated to a plastic or semi-fluid condition. Claim 7 does not refer to specific temperature but only to the plastic condition; while claim 5 omits the description of a plastic condition and specifies the temperature as "from about 160 degrees F. to about 225 degrees F." With respect to the product itself there was no one thing that was clearly new and not appearing in one or the other soaps long known and used; but the new feature aimed at in the patent was to bring together in a single bar of soap some of the advantages of both milled· and framed soaps eliminating some of their disadvantges. As to framed soaps the purpose was to retain their floating character but eliminate their tendency to warp; and as to milled soaps, the new bar was described as "retaining the advantage of its characteristic firmness, texture and shape-stability, to minimize its uneconomical use in water due to quick sliming and tendency to disintegration by virtue of water penetration into the cleavage planes."

We have seen what only was new in Bodman's discovery. In view of this, are the claims of the patent as issued valid? It is important to a thorough understanding of this question to compare from the file wrapper—see Schriber-Schroth Co. v. Cleveland Tr. Co., 311 U.S. 211, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132—the claims contained in the original application with the substituted claims made and allowed in 1940. The 1933 application contained claims which were all definitely related to Bodman's discovery with respect to a change in the crystallography or arrangement of the crystals in the soap mass as a result of agitation at sufficiently high temperatures. In this respect the claims were quite specific; but in comparison the claims allowed in 1940 are very general. The claims as allowed are, of course, entitled to the presumption of validity but this must yield to the requirements of the statute, 35 U.S.C.A. § 33, which, with respect to claims provides: "and he shall particularly point out and distinctly claim the particular improvement, or combination which he claims as his invention or discovery", if it is determined that this statutory requirement has not been met. After much consideration I have reached the conclusion that the claims do not comply with the statute in this respect. Permutit Co. v. Graver Corp., 284 U.S. 52, 60, 52 S.Ct. 53, 76 L.Ed. 163; Stelos Co. v. Hosiery Corp., 295 U.S. 237, 241, 55 S.Ct. 746, 79 L.Ed. 1414. The granted claims 5, 7, 13 and 20 in issue here do not distinctly claim Bodman's real discovery. As we have seen, the real discovery was that the soap mass agitated at sufficiently high temperature, that is, a temperature above its critical point, assumed a different physical phase, which means a different arrangement or form or combination of its molecules or crystals. This temperature varies for the water content of the soap mass. And the new phase of the soap determines its particular qualities or characteristics with respect to hardness or softness, its resistance to water penetration and its economical use. The specific critical temperature of the particular soap mass is therefore the all important thing in the process; but neither claim 5 nor claim 7 particularly points this out as required by the statute. Claim 7 does not mention the element of temperature in a plastic or semi-fluid condition, which was old in the art. Claim 5 does refer to temperature but apparently states that soap of *any* water content between 5 and 25% can be successfully converted so that it will have the new characteristics at *any* temperature between 160 degrees and 225 degrees. We have seen that this is not correct. Certainly the claim does not distinctly show that the required temperature is determined by and varies with the water content. And with respect to the product claims they specify only that the soap shall be floating, in a continuous mass, uniformly aerated and having the characteristic firmness and texture similar to milled soaps. The real discovery was that the new form of soap had very valuable qualities superior to milled soap with respect to water penetration and long wear in use. These are not described in the claims·other than what can possibly be inferred from the use of the expression "continuous mass".

The claims contain with respect to the process the additional elements of pressure and agitation in a closed chamber; but the evidence in this case shows that pressure has little if any effect on the product, and that the closed chamber feature is not essential; and the uniform distribution of the air in the final soap product results in part

at least from the rapid cooling of the soap after it has been extruded in bar form, and is not due only to the process described in the claim. The rapid cooling feature is not covered by the specifications or the claims. And as to pressure, the evidence also shows that the kind of pressure referred to in the patent specifications and the drawing is not actually used by either the plaintiff or the defendant in the production of its soap for commercial use. It is also significantly to be noted that the plaintiff has not offered in evidence samples of soap made in the Banbury mixer as described in the specifications; while the defendant has offered such samples produced as a result of numerous experiments with the Banbury mixer at different temperatures.

As I hold that the claims of the patent are invalid, the judgment must be for the defendant; but even if the claims can be considered valid, the result would be the same because I find there has been no infringement. As to the latter issue, I have less difficulty although the discussion necessarily requires careful consideration of the proper construction of the claims and the evidence in the case.

■ The patentee contends for a very broad construction of the claims or, what is substantially the same, a very broad range of equivalents with respect to the defendants' alleged infringing process and product. This broad construction contended for becomes argumentatively possible only by reason of the general wording of the 1940 claims. Claim 5 is the most important of the four claims in issue. The words and phrases that are in serious dispute as to their proper construction and scope on the issue of infringement, either of the process or the product, are underscored in the following copy of the claim: "5. The process of producing a floating soap having a *continuous* aerated mass with the uniform dispersion of fine voids throughout, and *a characteristic texture and firmness similar to milled soaps* and shape-stability, comprising introducing a soap mass containing about 5 to 25% *moisture* into a *closed* mixing chamber, working said mass in the presence of air while heating at a temperature of from about 160 degrees F. to about 225 degrees F. to uniformly distribute air throughout said heated mass, maintaining *sufficient pressure* on said mass to retain the air therein, releasing said mass to cause it to solidify in a *continuous* aerated state."

We must consider the proper meaning of each of these expressions in the light of the specifications and the evidence in the case. But we should first notice the theory advanced by the patentee, Bodman, in his oral testimony in the case in which he emphasizes as his invention the process rather than the product. He advanced the contention that his real discovery was that of a process method of *controlling* the resultant qualities of the particular soap that was desired to be produced. As his counsel puts it, the patentee is entitled to the exclusive use of the process to produce a soap of the *genus* described in the claims, although the process results in producing different *species* of soap, which may differ greatly in the degree of being soft or hard; or more specifically, the element of the claim with respect to the characteristic firmness and texture of milled soap is merely relative and therefore any soap produced, whether hard or soft, and though varying greatly in *latherability* and wear in use, is covered by the patent if it merely resembles milled soap in respect to firmness and texture, as compared with framed soaps. As Bodman expresses it in his testimony, what he discovered was how you could control the properties of soap with respect to its rate of wear, its water dispersion, water penetration or resistance to water penetration, and thus make a new kind of floating soap; or, in his own words, "so what I know I discovered here was a means for the first time of controlling the properties of soap and its behavior in water, the same composition by mechanical treatment rather than by chemical changes and formulae". And again—"We have always been able to get these variations in the lathering properties and in the firmness of the soap by chemical means; but I am the first one to say how you can get these variable qualities in soap by mechanical treatment * * *. You can control the qualities of the soap, hardness, softness, and lathering properties, sliming, or the degree of sliming, laminations and so on, by varying the temperature from 160 degrees to 225 degrees F. as in the Banbury mixer."

■ Here Bodman is insisting on a much broader patent right than is permissible under these patent claims. They say nothing about the qualities of latherability of the soap or its water penetration or rate of wear. Far less do they undertake to tell how these properties can be "controlled" for any particular soap formula by varying

temperature or pressure, or what the variations must be. When asked to explain how even a skilled soap maker could know from the patent specifications or claims how to produce a soap of particular characteristics as to latherability and rate of wear by the patent teaching, Bodman's answer was that such a person could *experiment* with the Banbury machine to reach the desired result. This clearly is not permissible under the patent statute which requires that the patentee shall describe in the patent the application of his process in such "full, clear, concise, and exact terms as to enable any person skilled in the art * * * to * * * use the same." Tyler v. Boston, 7 Wall. 327, 19 L.Ed. 93; United Carbon Co. v. Binney & Smith, Dec. 7, 1942, 63 S.Ct. 165, 87 L.Ed. ——; Standard Brands v. Yeast Corp., 308 U.S. 34, 38, 60 S.Ct. 27, 84 L.Ed. 17. It is true that in one or more places in the patent specifications there is a statement, in more or less vague terms, with respect to controlling the operation by the variation of temperature, but nowhere does the patent, as required by the statute, teach how the process can be used to obtain any particular desired result. What the specifications do teach is that if the emperical process outlined is followed the result will be a soap of the particularly described kind, that is, a soap having characteristic texture and firmness similar to milled soaps and being in a continuous mass with uniformly dispersed air; and from the specifications it will be found that the patentee says that the soap produced by the process will be a *hard* soap, even firmer than milled soap, and will wear economically.

Bodman's statement that the desired degree of hardness or softness of the soap can be obtained by varying the temperature from 160 degrees to 225 degrees is not in accord with the weight of the evidence, which shows that this variation in temperature is applicable to the varying water content with respect to the critical temperature at which the phase transition change occurs. The specifications read and considered as a whole, clearly do not teach that the degree of hardness or softness of the soap can be controlled (that is, determined) by the particular temperature. I find no sufficient justification for the patentee's present contention that his real discovery was how to *control* the properties of the soap resulting from the process.

In connection with the proper construction of the disputed language in the patent claims, it is well to point out here some of the difficulties that have arisen in this case which tend to confusion of thought or expression. In the first place, we have a long period of progress of the patent through the Patent Office. The original application was filed in 1933, amended substantially in 1936 and amended again in 1940 after the defendants' product was on the market. All the specific claims of the 1933 application, although allowed by the Patent Office in 1935, were abandoned in 1940 and claims in much more general language were substituted. Defendants' counsel have arranged in parallel columns and in different colored inks a comparison of these changes in the specifications and claims. Defendants' counsel say that these last changes in 1940 were for the purpose of "hitting the defendants' product" but "missing the prior art"; while counsel for the plaintiff say that the real reason for the 1940 changes was to drop out controversial and uncertain theory as to the process and simplify the statement by including only a definitely stated emperical process. I think there is something to be said for both these views. A comparison of the original application with the amendments in 1936 and the final changes in the specifications and claims in 1940 certainly creates the very definite impression that there has been a strong shift in emphasis with regard to the patent claims. The original and amended claims are entirely too numerous to examine in detail; but the general impression is that the 1933 application was for a process accomplishing a very definitely specified result with respect to the crystallography of the soap; while the 1940 claims, and to a large extent the specifications, were by the amendments made much more general in language. See Mackay Co. v. Radio·Corp., 306 U.S. 86, 98, 618, 59 S.Ct. 427, 83 L.Ed. 506.

Another difficulty in the case, which makes possible many separate controversies, results from the use of only general terms and expressions in the claims of the patent as granted. The words used are general English words which vary in meaning with their particular context. They are not technical words in the ordinary sense of that term, the meaning of which can be determined from their usage in the particular art. And even in the specifications to which we should of course look for their mean-

ing (Schriber-Schroth Co. v. Cleveland Tr. Co., 311 U.S. 211, 312 U.S. 654, 61 S.Ct. 235, 85 L.Ed. 132) some of them (as particularly the expression "texture of milled soap"), have different meanings in different contexts, and others, particularly the word "pressure" is defined in the specifications only by reference to the drawings of the Banbury mixer. And claim 5 is uncertain in its meaning in the coupling of soap varying from 5 to 25% in moisture content with a temperature range of 160 degrees to 225 degrees F. The claim does not clearly indicate how the water content and the temperature are to be related to one another. From the context one would think that the claim meant that a soap of any moisture content from 5 to 25% could be heated at any temperature between 160 degrees and 225 degrees and produce the described soap product; but we find from the evidence that this is not the case. The expression "plastic or semi-fluid" is not clearly defined either in the claim or the specifications. The latter, page 2, column 1, line 58, refers to the expression only as the condition resulting from the heating of the soap. The claim seems to indicate that the soap becomes plastic at any temperature from 160 degrees to 225 degrees. But if this was intended it is not clearly stated. Still other words of disputed and uncertain meaning are "closed" and "continuous". There is much force in the defendants' contention that these uncertainties or ambiguities are sufficient in themselves to make the claims invalid by the doctrine of United Carbon Co. v. Binney & Smith Co., supra.

■ Another difficulty in the case which tends to confusion on the issue of infringement arises from the fact that neither the plaintiff nor the defendants in the commercial manufacture of their respective soaps use a machine at all mechanically like the Banbury mixer, which was a batch machine operated under static conditions for the mixing feature. Both plaintiff and defendants use a different type of machine for a continuous manufacturing process. The specifications of the patent do not limit the process to any particular type of machine and do say that a continuous machine may be used; but without the description of its construction or operation. The plaintiff uses a machine called a "Converter" while the defendants use a continuous machine called the "Votator". Another tendency to confusion lies in the comparison of the de-

fendants' product "New Ivory" with the plaintiff's product "White Swan", when under the patent law it is not disputed that the question of infringement must be determined by a comparison of the defendants' process and product with the Bodman patent, and not with the plaintiff's product "White Swan" unless and until it is clearly shown that White Swan is produced by the patent process. And the evidence in the case shows that, quite apart from the comparison of the defendants' process with the patent process at least one of the qualities of White Swan is partly attributable to a particular method of cooling the soap after extrusion from the machine, which is not covered by the Bodman patent.

Still another difficulty in the case arises from the many different factors entering into the latherability and other qualities of particular soaps. These depend upon the chemical formula used for the soap making, upon the hardness or softness of the water in which it reacts, upon whether the water is hot or cold, and the amount of pressure on the soap bar employed by the individual user. And the patent specifications also state that the process is applicable to soap stocks made in any one of the three well recognized methods, by the cold process which is the chemical combination of the soap ingredients without super-added heat; by the semi-boiling process which involves added heat to a degree less than boiling, and by the wholly boiled process, all of which is more particularly described in the findings of fact. It is largely due to these difficulties and uncertainties that the trial of this case was so long protracted and involves so many controversies as to particular features of the process and product.

■ The burden of proof, or of persuasion, is, of course, on the plaintiff to show infringement of the process or product. I will first discuss the alleged infringement of the product. In the product claims 13 and 20 it is described as (1) a floating soap; (2) having a characteristic texture and firmness similar to milled soaps and shape-stability; (3) having a moisture content of less than about 25% and (4) having a compatible gas (air) finely disseminated through it in sufficient quantity to make it float. We have seen that there is no novelty in floating soaps having less than 25% moisture content, and also nothing new in a soap having a fine dissemination of air in it. The de-

fendants' soap as well as prior makes of soap have these characteristics. But the patentee claims a new combination of these elements in association with "a characteristic texture and firmness similar to milled soaps and shape-stability". As to shape-stability, practically all milled soaps have this characteristic. So that the narrow question of fact here is simply whether the defendants' soap has "a characteristic texture and firmness similar to milled soaps". The plaintiff alleges that it has and the defendants deny it. This is the simplest and perhaps the clearest issue of fact in the whole case.

We must first, however, determine what is fairly meant by the expression "characteristic texture and firmness similar to milled soaps". The word "texture" in its particular context is ambiguous in meaning. It is used in the specifications in different senses, dependent on the context, to mean (a) structure of the mass, (b) grain of the soap and (c) "feel" of the soap in the hand. However, I understand it is the contention of the plaintiff that in the claims the word "texture" refers to the fine, smooth, hard feel of the bar of soap in the hand. If the bar of the defendants' soap is broken in the middle for visual comparison with a similarly broken bar of standard milled toilet soap, it is apparent at once that there is a difference in appearance of the interior structure; although the plaintiff contends that if a cake of milled soap and one of New Ivory are diagonally sliced with a knife, the result in mere appearance presents similarity. This latter test, however, seems unimportant in the present connection, because it is the plaintiff's further contention that New Ivory importantly differs from milled soaps in that it constitutes a "continuous" mass of soap as distinguished from the mere agglomeration of pellets in the milled soap, the latter thus having laminations and cleavage planes which the plaintiff contends do not exist in New Ivory. Therefore on the present question, I will assume that "texture" means the smooth, hard feel of the soap. The "characteristic" texture and firmness of milled soaps at once distinguishes them from the general run of framed soaps which are very noticeably softer and rougher to the touch and hand pressure. The ordinary dictionary definition of the word "characteristic" means "alike" and not merely "somewhat alike".

The "characteristic" of a thing is its *unique* and *distinctive* feature. The characteristic texture and firmness of milled soaps is that they are glossy in appearance, waxy in feel, and firm against ordinary hand pressure. In these respects New Ivory is markedly different to the ordinary observer. It is *chalky* rather than waxy or *smooth* in feel, and it is noticeably soft when freshly made and as ordinarily purchased. Moderate pressure of a bar of New Ivory under the thumb and forefinger leaves a visible indentation in the surface of the soap; and if the pressure be applied at the corner of the bar, it will break off. Nothing like this occurs in a similar test of the standard milled soap, which does not at all yield to similar pressure and is distinctly *hard*. In other words, milled soap is a hard soap in its looks and feel, while New Ivory is comparatively soft. The latherability or sudsiness of the soap is not an element of the claims, but we find from the evidence that New Ivory is highly latherable, and it is claimed much more so than the old Ivory. Both parties to the case have submitted personal opinion evidence and also evidence of mechanical tests to determine the absolute or relative softness or hardness of milled soap in comparison with New Ivory. All these tests show that New Ivory is distinctly softer than standard milled soaps, although the witnesses testifying for the respective parties differ in the degrees of the comparison. But in this matter I take the view, as did Dr. Andrews, the present head of the Chemistry Department of the Johns Hopkins University, that the simple personal test is so convincing and conclusive that there is no need to resort to the allegedly more accurate scientific tests which in this case differ among themselves. Dr. Andrews, who is a highly competent expert with regard to the properties of matter, very clearly expressed the opinion that New Ivory did not have the characteristic texture and firmness of milled soaps. Samples of both were exhibited to the court on the first day of the trial and my personal observation at the time was in entire accord with Dr. Andrews' later expressed opinion.

Plaintiff's counsel emphasizes the supposed effect of the word "similar" in the phrase "characteristic texture and firmness *similar* to milled soaps". It is

argued that the effect of this word is that the element of the claims as to the firmness and texture of milled soaps is only *relative*, and that it is sufficient if by mechanical measurement the absolute hardness or softness of New Ivory is nearer that of milled soaps than framed soaps such as old Ivory. I think this construction of the context is not correct. It too greatly impairs the force of the word "characteristic" which means uniqueness and distinctiveness. But even more importantly the patent specifications and the evidence in the case show that what Bodman was striving for was to bring together in one bar of soap the characteristic *advantages* of *milled* and framed soaps, eliminating their defects. Bodman was also distinctly trying to convert Lifebuoy, a milled soap, into a *harder* and *firmer* soap than it then was. The firmness and smoothness of feel of milled soap was *one of the advantages* that it was desired definitely to *retain*. As the defendants' soap, New Ivory, does not have the characteristics of milled soap, it does not meet the description of the Bodman soap product as stated in the claims and therefore does not infringe the claims.

 There are other respects in which the defendants do not infringe the claims. The elements of the process as stated in the claims include the features of mixing the soap mass (1) in a "closed chamber"; (2) maintaining sufficient *pressure* on said mass to retain the air therein; and (3) (in claim 5) heating it to a temperature of from about 160 degrees F. to about 225 degrees F. To constitute infringement the burden is upon the plaintiff to show the existence of these conditions in the defendants' process. I conclude from the weight of the evidence that this burden has not been sustained by the plaintiff. The subject will be briefly discussed with respect to what is a "closed" mixing chamber, and what is the kind of sufficient pressure referred to; and also with regard to the temperature. In this connection some more particular description must now be given of the defendant's process.

 As previously noted, in the example given in the plaintiff's process, a Banbury mixer is the mechanical means used; while the defendants use an entirely different machine called a Votator; but the question is whether the conditions under which it is operated constitute it a *closed* mixing chamber, where the mixing is done under *pressure* within the meaning of the process claims of the patent. Though the Votator is clearly outside of the *example* of mechanical means given in the patent, the question is whether the Votator is within the *principle* of the patent. Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279. The defendants' process including the use of the Votator may be briefly described as follows. The principal ingredients of New Ivory soap are 80% tallow and 20% cocoanut oil. From this soap stock is made by the ordinary boiling process and has a moisture content of about 22%. The soap stock is then dried in a machine called a "flash drier" to about 22% moisture content, and is pumped in the semi-fluid state into the Votator. This latter machine is particularly described in the patent to Vogt, No. 1,783,864(1930). It is described in its patent specifications as adaptable for use in continuously freezing ice cream, and also for the processing of vegetables and animal oils and other materials wherein it may be desirable to alter the temperature and plasticity and/or the structure thereof while being agglomerated or whipped. The patentee says that "by means of the invention the process may be carried out at a high rate of speed, so that the well-known principle of quickly formed crystals being more minute than slowly formed crystals, may be practically utilized in the processing of many products of a crystalline or partly crystalline nature in which smoothness of texture is an important characteristic. In respect to ice cream, this machine may be conveniently used by injecting the mixture under pressure into one end with the proper quantity of fluid, such as air or carbon dioxide, to obtain the desired overrun, and forcing it under pressure while being frozen or whipped, through the cooling processing chamber".

As used by the defendants the Votator consists of a horizontal cylinder with an opening at one end into which the semi-liquid soap stock is pumped. The cylinder is equipped with an interior revolving drum, approximately concentric with the cylinder itself and largely filling the interior of the cylinder. To this revolving drum are attached long knives or scrapers, the cutting blades of which reach very closely to the inside walls of the cylinder. The cylinder itself is jacketed throughout most of its length for the reception and circulation of brine which

rapidly cools the inside walls of the cylinder. As the semi-liquid soap stock is pumped into one end of the cylinder it quickly forms a thin film of soap on the interior walls of the cylinder which is pared or scraped off by the revolving knives, and by the force of the *pumping* pressure the particles of soap are continuously pressed forward throughout the length of the cooling chamber, are mixed with each other and emerge into a funnel-like forward compartment of the cylinder where they are again further mixed by rotating members, and finally are extruded through an orifice at the end of the cylinder of a shape and size desired for the formation into bars of soap, and from there the long extruded soap bar is carried forward on a conveyor belt and quickly cut by a moving device into the lengths desired for particular bars of completed soap; and then at a later stage of the continuous operation they are appropriately pressed and stamped and wrapped ready for sale.

The semi-liquid soap stock enters the Votator at a temperature of about 220 degrees F.; is there quickly cooled by the cooling cylinder walls to a temperature of about 134 degrees, but when further mixed in the tapered funnel-like portion of the Votator the temperature by friction in mixing is again further raised so that the extruded bar at the center of the mass has a temperature of about 150 degrees to 155 degrees. The further process of cutting and stamping the bars is conducted so quickly that the soap mass is very rapidly cooled and differs in that respect from the ordinary run of framed soaps which cool only slowly. The whole processing of the soap in the Votator occupies only about 45 seconds as compared with an operation in the Banbury mixer of about 20 minutes or more. The output of the Votator is about 6,000 to 7,000 pounds per hour as compared with the Banbury output of less than 500 pounds an hour. It will be noted that the Votator acts somewhat on the principle of the old fashioned domestic ice cream freezer. The plaintiff's contention is that the conditions under which the soap is mixed in the Votator is within the principle of the patent and similar in physical conditions to those pertaining in the Banbury mixer with regard to a closed chamber and mixing under pressure. It is only in the Votator that the defendants' process is asserted to infringe the patent. The defendants' process with respect to cutting and cooling and stamping the bars of soap after they emerge from the Votator is not in issue in this case as the patent specifications and claims do not specifically include this part of the manufacture.

It is apparent at once that superficially at least the Votator is not a closed machine operating under pressure at all similar to the operation of the Banbury mixer. The patent specifications do not define what is meant by a closed mixing chamber other than in the example given with respect to the Banbury. In the latter the chamber is entirely closed during the whole operation by the insertion of the plunger in the neck of the mixing chamber, and the machine is thus wholly closed during the entire operation; while the Votator has in fact during the whole operation an opening at both ends. The plaintiff's contention is that during the operation the Votator is in effect closed by the soap going in at one end and going out at the other, and therefore is closed so far as the outer air is concerned.

Dr. Andrews expressed the opinion that the Votator could not properly be considered a closed chamber, and gave his reasons therefor. He said he approached the question from the point of view of thermo-dynamics, and that functionally the operation of the Votator was quite different from that of the Banbury mixer. He said "so that I think one has to take perhaps a functional view in interpreting the word 'closed'. Now I regard the essential conditions as very different, when you have material entering, passing through a zone, where the fundamental physical properties, such as pressure and temperature, are changing constantly all the way through the zone, and then the material flowing out of the other end. I regard that as very different functionally from a condition where material is put in, is operated for a definite length of time under those conditions, which essentially are constant, and then as a batch the material is dropped out. And it is largely from that point of view that I make my statement that I would not regard it as a closed chamber." On consideration of the whole evidence in the case, I accept and adopt this opinion of Dr. Andrews as correct.

And with regard to "pressure", it is also obvious that the kind of pressure mentioned in the patent (where the volume of

the soap charge introduced is sufficiently large to overflow from the mixing chamber itself up the neck of the machine until the plunger in coming down rests upon it and presses it by its own weight, or by super-added steam pressure as explained in the specifications), is very different indeed from the pressure referred to as operative in the Votator. In the Banbury the pressure is static and continuously operating on the soap stock to compress it. In the Votator the only pressure on the soap is from the force of pumping it through the cylinder, and not for the purpose nor with the effect of compressing the soap mass itself. The analogy is to water pumped through and flowing out of a pipe. The pressure referred to and described in the patent is not otherwise defined than in terms of the pressure of the plunger in the Banbury, except possibly in an uncertain reference to "working pressure". At one stage in the trial of the case I understand counsel for the plaintiff to express the view that the pressure referred to in the patent included the pressure on the soap mass resulting from its agitation, and therefore the pressure in the Votator from agitation was such pressure as is referred to in the patent; but I do not construe the patent to define pressure in that latter respect. Furthermore, the operation in the Banbury, except for the agitating process, is wholly *static* with respect to pressure and temperature. In contrast the operation in the Votator is *dynamic*, and marked temperature changes are occurring in the course of the progress of the soap through the machine. This was also clearly pointed out by Dr. Andrews. It should be added that the weight of the evidence in this case convinces me that the elements of a closed chamber and pressure on or compression of the soap mass are of comparatively little importance in the qualities of the completed soap. It is the temperature at which the soap mass is agitated that is the vital and important feature of the process.

With respect to temperature, the plaintiff contends that it is only the *final* temperature in the mixing process that is important; while the defendants contend that in the manufacture of New Ivory the *rapid initial cooling* in the Votator is an important element in its process, as explained in its Mills patent No. 2,295,594, September 15, 1942, offered in evidence by the plaintiff as its Exhibit No. 41. In that patent the specifications state—"the crux of my invention is the discovery that mechanically agitating or working soap while it is being cooled from a fluid state to various degrees of plasticity causes the formation of beta soap only, and only when the final temperature of the soap extruded from the agitating operation is reduced below a critical value which varies with the chemical composition of the real soap portion of the mass and with the moisture content; also, that when the temperature of the soap extruding from this cooling operation is kept to a lower limit at which the mass substantially loses its pasty cohesiveness, a product is formed which is softer and less tough and translucent than a milled soap of like formula."

Of course the validity of this Mills patent describing the process under which New Ivory soap is made is not here directly in issue, and the granting of the patent is no defense to the defendants if the process in fact infringes the plaintiff's patent. And the specifications in the Mills patent are referred to merely as explanatory of some of the defendants' contentions with respect to the nature of its process.

With further reference to the important matter of temperature, it is to be noted that the final temperature at which the defendants' soap is extruded from the Votator is about 150 to 155 degrees. This is, of course, a slightly lower temperature than 160 degrees to 225 degrees as specified in claim 5 of the patent. But the plaintiff says that 150 to 155 degrees is at least *about* 160 degrees and therefore the defendants infringe. And I would agree that this is so if the only difference in the case was a matter of a few degrees one way or the other. However, the weight of the evidence in the case convinces me that the practical importance of the temperature range is not that merely of a few degrees above or under 160, but exists only when we compare the results of soap of the same chemical formula and moisture content processed at temperatures of around 155 degrees as compared with temperatures of about 190 degrees.

All the claims also include the element of "a continuous aerated mass" resulting from the process. The burden of proof to show infringement is on the plaintiff to demonstrate that the defendants' New Ivory is a continuous aerated mass; and

it is not clear on the whole evidence that this burden has been met. The function of the air in the mass is merely to make the soap a floating soap and this condition was old in the art. In fact otherwise the presence of the air tends to be a detriment rather than a benefit to the economical use of the soap. As is pointed out in the evidence, when the customer buys a large cake of floating soap containing a substantial percentage of air, he is buying air rather than soap. Also the presence of air is a disadvantage if it is distributed in large pockets giving opportunity for water penetration and disintegration of the bar. And the evidence shows that, while the thorough agitation and mixing of the soap in the presence of air tends to uniformly distribute the air through the soap when in a plastic condition, the air bubbles will tend to combine and form larger air pockets unless, after the extrusion of the soap mass, it is quickly chilled. Therefore the final result of the completed soap bar ready for use is dependent very largely on the chilling operation after extrusion, a feature not comprehended by the patent.

The feature of "continuity" of the mass is aimed particularly at avoidance of fissures, cleavage planes or laminations in the typical milled soap which results from the mere plodding or compacting process of small pellets of solid soap. The intensive agitation and mixing of the plastic soap naturally tends more closely to compact the soap particles and the result of this very intensive working of the soap in the plaintiff's Converter and the defendants' Votator produces what appears to be a much more thoroughly compacted mass than in the case of milled soaps which are merely plodded and pressed together in the final process. Thus both New Ivory and White Swan when the bars are broken apart have a much more compact appearance than appears on the breaking of milled soap. The plaintiff contends that both White Swan and New Ivory are alike in their alleged continuous mass, but the defendants say that the effect in New Ivory is apparent rather than real because the fissures or laminations are there although not visible to the eye. In support of this contention the defendants have introduced photo-micrographs of the interior of bars of New Ivory. Opposing this are other photo-micrographs introduced by the plaintiff tending to show the contrary. The expert witnesses do not agree as to the interpretation of the photographs; and it is not possible for the court to make a definite finding with regard to them. Dr. Andrews states that no real comparison with respect to the physical phase condition of soap can fairly be made merely upon observation of the soap mass as the phase condition depends upon molecular or crystalline arrangement which cannot be determined except by X-ray pictures. The claimed superiority of White Swan by virtue of the stated continuity of the mass is that the soap does not so readily slime and disintegrate on use. If the comparison on effect of use is made with New Ivory, the weight of the testimony shows that the latter does readily slime. The plaintiff has submitted some photographic measurements of New Ivory as compared with milled soaps which tend to show by measurement less water penetration on New Ivory than the milled soaps used in the experiments. But the matter of latherability and water degree of penetration is so very difficult of practical measurement and demonstration that I think the opinion evidence of Dr. Andrews, with his reasons therefor, are more persuasive, being based on personal observation.

Something should be said with respect to the process actually used by the plaintiff in the commercial production of its White Swan soap alleged to be under the patent process. As has been pointed out, the plaintiff does not make its soap in the Banbury mixer but uses a continuous machine called by it a "Converter" which is described in the patent to Pease, a member of the plaintiff's research department. This patent was a co-pending application with Bodman and the serial number and filing date were left blank in the Bodman original application. On June 31, 1934, Bodman inserted the serial number and filing date of the Pease application as No. 685,-528, filed August 17, 1933. On May 2, 1934 the Patent Office required that reference to Pease be cancelled because, being subsequently filed, it constituted new matter. After first contesting this position Bodman on August 6, 1935 acquiesced and cancelled the new matter.

The plaintiff's so-called Converter covered by the Pease patent need only be briefly described because, as has been pointed out, the question of infringement in this case is to be judged on the Bodman patent and not on comparison of New Ivory with White Swan. Briefly described, the plaintiff's Converter is also a horizontal cylindrical machine jacketed for artificial heat and equipped with two powerful screws

which agitate, grind and thoroughly mix the soap mass. The latter is introduced at ordinary room temperature in the form of solid dried soap pellets with a moisture content of about 20%. The artificial heat is supplied to render the soap mass plastic or semi-fluid and it is extruded from the cylinder at a temperature of about 185 degrees. It is then, by means not stated in the Bodman patent, quickly cooled and cut into bars of the requisite length. The final product is a soap of the omega type; the bars are hard and firm to hand pressure like milled soap. It also seems to be a continuous mass and the air bubbles in the final product are apparently small and well distributed. In the class of soaps, whether hard or soft, it is distinctly hard as compared with the defendants' New Ivory. In comparing the process in the Converter with that in the Votator, the important difference is with respect to temperature. In the Converter this is apparently constant; while in the Votator it is variable. In the initial process the soap introduced into the Converter is dry and solid and at room temperature; while in the Votator the soap is introduced in the form of neat or kettle soap which is said to be plastic or semi-liquid. The jacket of the Converter is used to supply artificial heat; while the jacket of the Votator supplies brine for quick cooling, the temperature of the soap on entering the Votator being about 220 degrees. The conditions as to the pressure and the alleged feature of a closed chamber seem to be about the same in the Converter and Votator. Viewing the evidence as a whole, in comparison of the Converter and the Votator with the patent process, I conclude that the conditions affecting the product of White Swan are not those prescribed in the patent. The question of infringement, therefore, cannot be properly determined by a comparison of New Ivory with White Swan. Hartford-Empire Co. v. O'Bear-Nester Glass Co., 8 Cir., 39 F. 2d 769, 771. But, if the comparison is made, material differences are found in the properties of the two soaps because White Swan is of the omega phase while New Ivory is of the beta phase, as heretofore explained. It is also to be noted that White Swan is made from a chemical formula different from that of New Ivory in that the former contains a much higher percentage of cocoanut oil, which increases its latherability over what it would otherwise be if there were used the same chemical formula as in the case of New Ivory.

Bodman's so-called "control" of the latherability of the soap is due to its *chemical* composition and not to *physical* changes resulting from the patent process.

The principal difference in use between old and New Ivory is that the latter has greater latherability and is for that reason more adaptable for use in hard water regions. It may also be noted that there is little or no evidence in this case as to any particular commercial success of either White Swan or New Ivory although it is a matter of common knowledge that both are extensively advertised by radio and otherwise. It may be thought that the chief commercial advantage of both New Ivory and Swan lies in the ability to make them on a mass production basis in the continuous machines known as the Votator and the Converter, each separately patented, rather than to any special qualities of the soap, or the particular process used.

There is another line of evidence in the case which is much emphasized by counsel for the plaintiff. Some time in the fall of 1937 the defendants came into possession of some samples of White Swan soap, before it had been put upon the market or made public. The plaintiff has offered evidence by depositions to the effect that these samples of White Swan were obtained from the plaintiff's confidential laboratory by corrupt collusion between minor employes of the plaintiff and defendant companies. Mr. Countway, president of the plaintiff, testified at the trial that in January of 1938, in a casual railroad train conversation with Mr. Deupree, president of the defendant, the latter drew a little picture of a bar of soap which he said he had seen and told Mr. Countway in effect that if Lever Brothers intended to put this new soap on the market in the near future he, Mr. Deupree, would think it unfair competition with Procter & Gamble's well established old Ivory soap; and Mr. Countway said that Mr. Deupree referred to the drawing of the new White Swan (which apparently had not been named) as a new invention. Mr. Countway said he naturally was evasive about the matter. Mr. Deupree testifying as a witness in this case, said that he simply did not recall any such conversation. However, Mr. Countway shortly thereafter made a memorandum of the conversation and reported it in a letter to his business associate in England. There resulted thereafter two separate suits additional to this one, between the parties. One is a suit based on unfair competition

by Procter & Gamble against Lever Brothers (presumably with respect to the alleged resemblance of the new White Swan soap in form and appearance to old Ivory soap), now pending in Ohio; and the other a suit for damages pending in this court by Lever Brothers against Procter & Gamble presumably based on the obtaining of samples of White Swan above referred to. In view of the pendency of the latter suit in this court it is not appropriate to now comment upon the line of testimony referred to other than to say that on the basis of the deposition testimony, the commercial ethics involved were obviously subject to definite criticism. I do not understand, however, that counsel for the plaintiff contend that the evidence shows criticizable complicity by the superior officers of the defendant with respect to the retention of samples of White Swan soap. It is perhaps inferable that if Mr. Deupree was conscious of the conditions under which it is said the samples were obtained, he hardly would have mentioned the matter to Mr. Countway. The plaintiff contends that the defendants' activities which led to final production of New Ivory soap put upon the market in March 1940, were originally stimulated by their examination of these samples of White Swan soap. On the contrary, Mr. Mills, one of the superior members of the research department of Procter & Gamble, testified that prior to seeing the samples he had been working on an idea to improve the latherability of old Ivory soap; as it was long well known in the trade that Lever Brothers had been intending as soon as practicable to make a white floating soap to compete with old Ivory soap. Mills was not clear in his recollection as to just when he had seen the samples of White Swan; but he said very definitely that when he did so they were not helpful in his efforts to improve Old Ivory soap as to its latherability because White Swan was a soap of a very different character from his conception of the New Ivory soap. His particular objective was to make a soap that was much more freely latherable than old Ivory soap so that it would have a greater success in hard water regions of the country.

Whatever may be the real merits of the facts with regard to this incident of the samples of White Swan soap, but assuming for the purposes of this case the correctness of the plaintiff's contention with respect to the ethics involved, the question of patent law remains as to what is its effect on this case. The testimony was introduced by the plaintiff mainly on rebuttal and was offered as bearing not on infringement but on the validity of the patent claims. It seemed to me at the time it had little bearing on the patent claims but possibly might have relation to the question of infringement. Although offered in rebuttal I therefore admitted the testimony. And of course its nature is such as to cause the most critical scrutiny of the defendants' position on the proposition of patent law applicable. However, it is entirely possible to attribute too much importance to an incident of this character, the natural tendency of which is to put out of focus the correct legal point of view. The result of my consideration of the matter is that for the reasons previously indicated in this opinion, the particular incident, deplorable as it appears to have been, does not really affect the legal problems which are here presented.

In this long private litigation between the two leading soap manufacturing companies in this country, we must not overlook the public interests with respect to patents but, as recently reminded by the Supreme Court, we must consider "the public interest sought to be safeguarded by the patent statutes, and so frequently present but so seldom adequately represented in patent litigation". Muncie Gear Co. v. Outboard Co., 315 U.S. 759, 768, 62 S.Ct. 865, 870, 86 L.Ed. 1171.

The length of this opinion is already so great that no detailed discussion of the prior art and uses is practicable, beyond what has already been noted on that subject. Reference may however be made to the findings of fact for further details on that branch of the case. It must suffice here to say that I do not find in the prior art or uses any clear anticipation of the real discovery that Bodman made with respect to the phase transition change in soap from intense agitation at sufficiently high temperatures. Apart from this, however, the prior art does show substantially all of the different steps of Bodman's process as outlined in the patent and embraced in the claims.

To summarize, my conclusions are (1) that the patent claims are invalid because (a) they do not particularly and distinctly claim the real discovery made by Bodman; (b) their wording is so general and in some respects so ambiguous that they fail to comply with the statutory requirements of 35 U.S.C.A. § 33; (2) if the claims can

be considered valid at all, then, in view of the prior art, they must be strictly limited to their several and particular elements without the wide range of equivalents contended for by plaintiff's counsel; and as so limited the defendants' process and product does not infringe.

The necessary conclusion is that judgment should be entered for the defendants with allowance of taxable court costs. Counsel may submit the appropriate decree in due course.