## LEVER BROS. CO. v. PROCTER & GAMBLE MFG. CO. et al.

### No. 5151.

Circuit Court of Appeals, Fourth Circuit.

Dec. 28, 1943.

634

William D. Mitchell, of New York City (Edgar Allan Poe, of Baltimore, Md., William H. Davis and Worthington Campbell, both of New York City, Walter J. Blenko, of Pittsburgh, Pa., John Hoxie and Eben M. Graves, both of New York City, and Floyd S. Davis, of Cambridge, Mass., on the brief), for appellant.

Marston Allen, of Cincinnati, Ohio (Drury W. Cooper, of New York City, Frank B. Ober, of Baltimore, Md., Erastus S. Allen, of Cincinnati, Ohio, Francis G. Cole, of Washington, D. C., and David Fox and Louis Quarles, both of Milwaukee, Wis., on the brief), for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Lever Brothers Company (hereinafter called Lever) brought a civil action for patent infringement against the Procter and Gamble Manufacturing Company and the Procter and Gamble Distributing Company (both hereinafter called Procter) in the United States District Court for the District of Maryland. The patent in suit is United States Patent No. 2,215,539 (hereinafter called the Bodman patent), issued to John Bodman on September 24, 1940. Application for the patent was filed by Bodman on April 8, 1933, and the application was amended on June 18, 1936, and again in 1940. Shortly before the issuance

of the patent, Bodman, who was director of the Research Department of Lever, assigned the patent to Lever.

The District Judge filed extensive findings of fact, appropriate conclusions of law based on these findings, and an elaborate opinion, 49 F.Supp. 443, in which he held the patent in suit invalid and decided there was lack of infringement. Judgment was accordingly entered for the defendants, the complaint was dismissed, and Lever has duly appealed.

### 1. Framed Soap and Milled Soap.

Prior to the work and experimentation by Bodman, in connection with his patent, soap in bar form for domestic use was divided into two types, known as "framed" soap and "milled" soap. Each type had distinctive advantages and disadvantages, with which soap makers were quite familiar.. These soap makers fully knew the enormous commercial profit that would result if a new type of soap could be developed which would possess a maximum of the advantages of both types of soap with a minimum number of the disadvantages attaching to these two types. Bodman's endeavors were directed toward the solution of this problem.

Framed soap was generally made by mixing the soap stock in an open crutcher, after which the soap was poured into a frame or mould, allowed to cool and cut into bars. The soap could be aerated in the crutcher by stirring in air. Framed soap had a high water content and could be easily made to float; but it tended to warp, and since the air dispersion was coarse and uneven, it did not possess the fine texture or feel which was desired by many fastidious housewives. Procter's Old Ivory was an outstanding example of a floating framed soap.

Milled soap is subjected to milling and plodding. From the kettle, the soap is fed to a cooling roll, solidified in thin films and it then goes through a drier, where the water content is reduced. The dried soap is then fed onto a series of rolls, making up a mill, which, by a squeezing process, causes the soap to become homogeneous. From the mill, the soap emerges in ribbons and then goes to a "Hinkle" which it leaves in the form of small pellets. Then these pellets of soap are fed into a plodder, which squeezes the pellets together, and compacts them. The soap is extruded as a continuous bar. This bar is cut into cakes, which are pressed and stamped. Milled soap has a fine texture or feel, holds perfumery well and does not tend to warp; but it does not float and develops laminations or cleavage planes into which water may enter and cause the soap to swell and disintegrate.

### 2. The Bodman Patent.

The patent was both a process patent and a product patent. There were 20 claims, the first 10 for the process, the last 10 for the product. Lever, in its brief (page 1) states: "As the product claims are closely interwoven with the process, it is enough for the purposes of this appeal to discuss the process." We proceed on this theory.

The important claims are numbers 5, 7, 13 and 20. These claims read:

5. "The process of producing a floating soap having a continuous aerated mass with a uniform dispersion of fine voids throughout, and a characteristic texture and firmness similar to milled soaps and shape-stability, comprising introducing a soap mass containing about 5 to 25% moisture into a closed mixing chamber, working said mass in the presence of air while heating at a temperature of from about 160 degrees F. to about 225 degrees F. to uniformly distribute air throughout said heated mass, maintaining sufficient pressure on said mass to retain the air therein, releasing said mass to cause it to solidify. in a continuous and aerated state."

7. "The process of producing a floating soap having a continuous aerated mass with a uniform dispersion of fine voids throughout and a characteristic texture and firmness similar to milled soap and shape-stability, comprising introducing a soap mass containing less than about 25% moisture into a closed mixing chamber, working said mass under pressure in the presence of air and while in a plastic or semi-fluid condition to uniformly distribute air throughout said mass, and forming the mass into bars or cakes."

13. "A floating soap, having a characteristic texture and firmness similar to milled soaps and shape-stability, said floating soap having a moisture content of less than about 25% and having a compatible gas finely disseminated through it in sufficient quantity to make it float, said floating soap resulting from the cooling of a plastic or semi-fluid soap mass containing less than about 25% of moisture subjected, in the presence of the gas, and under pres-

sure, to mechanical agitation to disseminate under pressure the gas through the mass at a temperature sufficiently high to render it at least plastic or semi-fluid."

20. "A floating soap having a uniform dispersion of fine voids throughout its mass, and a characteristic texture and firmness similar to milled soaps· and shape-stability, with a moisture content of less than about twenty-five per cent, said floating soap resulting from working in a closed mixing chamber a continuous soap mass containing about 5 to 25% moisture in the presence of a compatible gas under pressure, while the mass is heated to a temperature of from about 160 degrees F. to about 225 degrees F., and then releasing the mass to cause it to solidify in a continuous and aerated state."

The essential elements of the Bodman process may be briefly summarized as involving the following steps and conditions:

1. The preparation of a soap mass with a low moisture content (less than about 25%); and

2. While this soap mass is in a plastic or partially melted condition, as the result of a temperature ranging from about 160° F. to about 225°;

3. The intense agitation and working of the soap mass;

4. In the presence of air;

5. Under pressure; and

6. In a chamber that is closed to the atmosphere.

We might note that the wording of Claims 5 and 7 is almost identical, with the single exception that while Claim 5 precisely points out in degrees the temperatures at which the soap mass is to be heated, Claim 7 omits any specification of temperature in terms of definite degrees. In like manner, Claim 20 thus specifies the temperature, while this is omitted in Claim 13.

3. The Validity of the Bodman Patent.

(a) The Claims and Specifications.

▇ The District Court held the vital claims of Bodman (apart from the prior art) to be inherently invalid on two grounds: (1) These claims do not properly describe and define Bodman's real discovery or invention, and (2) The terms of the claims, if the broad construction for these terms urged by counsel for Lever be upheld, are so uncertain and so ambiguous that these terms fail to furnish sufficient information of the process to persons· versed in the soap-maker's art, as is required by 35 U.S.C.A. § 33. We shall discuss these grounds in the order set out above.

The holding of the District Court that Bodman, in his claims, did not properly describe his real discovery or invention was based largely on the court's finding that Bodman's discovery was limited to a soap that could be made at a temperature of not less than 190° F. with a water content of 15% or more. The District Court appears to have believed that Bodman claimed that soap produced by his process possessed the desirable characteristics of milled soaps to the full extent of very hard milled soaps, and that soaps made under the Bodman process at temperatures below 190° failed to comply with this standard.

A careful reading of the entire patent, we think, will disclose that Bodman did not claim for soap made under his process the fullest degree of the advantageous characteristics of milled soap at all the ranges of temperature. Thus, we find in the patent such expressions as:

"My process may be carried out to produce a bar or cake of the new floating soap, of novel structural and other characteristics more nearly resembling a milled soap than a framed soap, in that it may possess· some characteristics similar to those of the finest milled soaps, such as firmness, fine grain or texture, smooth 'feel' to the fingers, and ability to retain the more volatile perfume, and does not warp on aging and drying."

"Although the soap of the present invention resembles milled soap in appearance and in some of its characteristics, it is distinctly not a 'milled soap'."

"* * * Satisfactory results have, however, been obtained by maintaining a. given pressure on the soap mass, say about twenty-five pounds per square inch, and varying the temperature according to the degree of the characteristic properties desired in the new soap, that is, in the rate of wear, ·water absorption and water penetration or resistance to water penetration."

"* * * it being understood that various pressures may be employed depending on the character of the soap product desired."

The record, too, discloses that, in spite of the clear distinction between framed and

milled soaps, different varieties of milled soaps vary widely among themselves as to the degree and extent to which they possess the advantageous characteristics of milled soaps in general. This is obvious, for example, upon a comparison of Camay, one of the harder milled soaps, with Lifebuoy, a soft milled soap. We think that Bodman had in mind, and expressed in his patent, the clear idea that by varying the moisture content and other conditions within the specified range of temperature, the various characteristics of the soap produced, including particularly the qualities which resembled the qualities of milled soap, could (and would) be obtained in varying degree or degrees.

We think the District Court erred in holding that Bodman's claims should be limited to a process around 190° F.

In this connection, we first note a statement in the District Court's opinion: "We are left to conjecture why the temperature range for a satisfactory floating soap was thus altered and lowered from 190° to 160° without explanation." Bodman's contemporary explanation of the charge was: "Certain of the temperatures given on page 18 for the treatment of soap have been corrected to accord with the stated temperatures in other parts of the description and in the claims."

There are many places in Bodman's original application (filed in 1933) in which the lower temperature is indicated.

" * * * A soap stock subjected to the conditions of the present process will produce a floating soap if the temperature of the soap mass under treatment ranges from about 160° F. to about 225° F."

" * * * The steam or other heating medium circulating in the jacket of the apparatus will heat the soap mass preferably to a temperature of from about 160° to 230° F."

" * * * subjecting the soap mass to a temperature which may range from about 160° F. to not substantially exceeding 230° F. * * *"

It might be noted, too, that Claim 7 of the Bodman patent contains no reference to temperature in specific degrees.

The 1933 specifications of Bodman (repeated in the 1936 specifications) contained the statement: "Satisfactory floating soaps are produced at temperatures varying from 190° F. to about 210° F."

At the trial, the following colloquy ensued, with reference to this statement, between counsel for Procter and the District Judge:

"Mr. Marston Allen: Yes, sir. Now that was their actual statement up until after our soap came out on the market.

"The Court: Maybe they learned better and they finally changed.

"Mr. Marston Allen: Well, that may be, but in the meantime we were on the market with our soap. If they changed their disclosure, it seems to me that that is the whole thing."

The District Court, evidently impressed by this colloquy, directed the reporter to mark this colloquy in his notes. But the file wrapper clearly discloses that this change was made on March 12, 1937, three years before New Ivory Soap appeared on the market and about nine months before Procter even ordered apparatus for the production of this soap.

If this picture be viewed as a whole (and, in our opinion, that is the proper viewpoint), we conclude that the District Judge placed too great an emphasis upon the element of the temperature of the soap mass. "A patentee may be boldly empirical, seeing nothing beyond his experiments and their results." Mr. Justice McKenna in Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 433, 31 S.Ct. 444, 447, 55 L.Ed. 527. Bodman made many experiments in his endeavor to find a new process under which could be produced a soap possessing more of the desirable qualities and fewer of the undesirable qualities of both milled and framed soaps than any type or kind of soap then known to the soap-maker's art. He sought (and we believe he ultimately found) a novel and important process for controlling the properties of soap by mechanical treatment rather than by chemical changes and formulae. He duly emphasized that other conditions, as well as temperature (pressure and moisture content, for example) might be varied according to the characteristics desired by the soap maker. Elasticity, rather than rigidity, of process, he regarded as a fundamental philosophy in any process he hoped to develop. That seems to be reflected all through his experiments, his findings and his theory. This is further borne out by Bodman's testimony as to his experimental tests and their results, also as to his progress reports.

In the trial of this case, and in the opinion of the District Court, great stress was laid on the "phase" theory of soap. This theory, stated simply, is that if soap is worked above the temperature at which the soap is completely melted, it will solidify into soap of the "omega" phase; but if the soap is worked below this temperature, the soap will solidify, partly or wholly, into soap of the "beta" phase. This theory, too, postulates a precise "critical temperature" (comparable to the temperatures at which water boils or freezes), at which there is a sudden transition from one phase to another. We are not impressed by either the theory or the relative importance assigned to it as a factor in the instant case.

The theory seems to have been born after the development of Bodman's process. Professor Andrews (a chemist of unquestioned distinction), one of Procter's leading expert witnesses, admitted that "omega" soap had not been recognized in the literature of the subject, and he admitted further that if a bar of soap were broken in half, he could not tell by inspection whether it was "beta" or "omega" soap or whether it possessed the characteristics of one phase or the other. Nor are we completely convinced that the "critical temperature" marks a sharp dividing line, precisely determinative of the phase assumed by the entire mass of soap, rather than the edge of a zone in which the phase-change is progressive rather than sudden.

We pass rapidly, for several reasons, over Bodman's "network" theory of progressive crystallization of the components of the soap mass. Bodman abandoned this theory and it does not appear in the patent as it was finally issued. Our patent laws do not require an inventor to be a Lavoisier or a Pasteur. And we think, in this case, too much attention has been paid to fine-spun theories of higher chemistry and too little heed has been given to the intensely practical aspects of the soap-maker's art. As Mr. Justice McKenna said of a patentee, in Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527. " * * * if he has added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor. And how can it take from his merit that he may not know all of the forces which he has brought into operation? It is certainly not necessary that he understand or be able to state the scientific principles underlying his invention, and it is immaterial whether he can stand a successful examination of the speculative ideas involved. * * * He must, indeed, make such disclosure * * * of his invention that it may be put into practice. In this he must be clear. He must not put forth a puzzle for invention or experiment to solve, but the description is sufficient if those skilled in the art can understand it. This satisfies the law, which only requires as a condition of its protection that the world be given something new and that the world be taught how to use it. It is no concern of the world whether the principle upon which *the new construction acts be obvious or obscure, so that it inheres in the new construction.*"

The Bodman patent is further criticised because it provides for varying conditions (notably temperatures, pressure and moisture content), without correlating these conditions and without specifying, in accurate detail, in just what degree soap of each type will possess the many different qualities of soap, under the many combinations of these conditions which could be readily effected within the terms of the patent. We think it is both impracticable and unreasonable to require Bodman to set out an extended list of precise combinations and formulae with specific designation of the exact characteristics obtaining in each different type of soap thereunder produced. It would, indeed, be difficult to ascertain how many different formulae would be necessary under so rigid a requirement.

Nor, in our opinion, does this bring the patent under the condemnation of the federal statute, 35 U.S.C.A. § 33. Bodman testified emphatically: " * * * I have had no difficulty at all in giving this process to common, ordinary workmen, and they control it every day and every hour of the year. If they lose the marshmallow they know what to do. I don't even have to tell them."

No soapmaker was brought forward to testify that he found any difficulty in understanding, or working under, the Bodman process as it was set out in the patent. The experimentation, for which the patent provided within its borders, was not necessary either to determine just what the process discloses or to practice the process

and determine whether or not the process was workable; rather was this experimentation necessary, under a workable process, to adapt this process to the particular materials, desires and needs of the individual soapmaker employing it.

If this be true, the patent is not invalid under such cases (cited by the District Court) as Tyler v. Boston, 7 Wall. 327, 19 L.Ed. 93; Standard Brands v. Yeast Corporation, 308 U.S. 34, 38, 60 S.Ct. 27, 84 L.Ed. 17; United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165. Then, we think, is applicable the statement of Circuit Judge Swan in Franc-Strohmenger & Cowan v. Arthur Siegman, Inc., 2 Cir., 27 F.2d 785, 786:

"It is argued that this is too indefinite to teach necktie manufacturers how to use the patent; that the material and texture of the lining is crucial to the combination, and is not disclosed. It is true that it leaves to the manufacturer an undefined latitude of choice; he is to select a lining that has the required qualities, and the claims cover any lining which does have them. The question is whether, given this disclosure, the tie maker, of ordinary skill in the arts, could make the patented tie without resort to independent invention. * * *

"* * * Silks vary in elasticity, and it may require some experimentation to determine in each case what lining will do and what degree of looseness in the stitching. But this is inherent in the subject, and we fail to see how the invention can be more definitely stated, unless the inventor is to be required to describe a specific application of his inventive thought, to which he will be limited."

See, also, Circuit Judge Soper's opinion in Procter & Gamble Mfg. Co. v. Refining, Inc., 4 Cir., 135 F.2d 900, 906, and cases there cited.

In connection with Bodman's failure to comply with 35 U.S.C.A. § 33, the District Court stressed the ambiguity and uncertainty of certain important terms used in the claims of the patent, such as "pressure", "plastic or semi-fluid", "closed", "continuous", "texture", "characteristic" and "similar".

■ In all important legal instruments, the use of words with precision and exactness is surely a consummation devoutly to be wished. In few, if any, of these instruments is this quite so true as in the specifications and claims of a patent. Weasel words have no place there. But the federal statute hardly requires even an approximation of perfection. Semantics is not an exact science. And surely it is more difficult to obtain the desired precision and exactness in the description of an industrial process than in the description of a machine. The words of Bodman's specifications and claims must be judged in the light of the vocabulary available to a soapmaker.

■ We are fully conscious of "the public interest sought to be safeguarded by the patent statutes, and so frequently present but so seldom adequately represented in patent litigation." Mr. Justice Jackson, in the recent case of Muncie Gear Works v. Outboard Marine & Manufacturing Co., 315 U.S. 759, 768, 62 S.Ct. 865, 870, 86 L.Ed. 1171. We cannot forget, though, that the purpose of the patent statutes is also to stimulate invention and that inventors should not be deprived of the fruits of their labors by too technical a nicety in the requirement that inventions must be adequately described to indicate their real scope and their true content. As Circuit Judge Soper said, speaking for this Court, in Procter & Gamble Manufacturing Co. v. Refining, Inc., 4 Cir., 135 F.2d 900, 906:

"* * * It was not necessary or practicable for Clayton to specify the exact degree of emulsion breaking temperature or the precise length of time needed for the substantial neutralization of every quality of oil that might be subjected to refinement; and the evidence shows that the information given was entirely adequate to persons skilled in the art. * * *

"There are many situations in the practice of the arts in which specific directions are properly omitted from the claims of patents because greater definition is either impracticable or is unnecessary to inform the art, and would serve only unduly to limit the scope of the invention or to invite evasion by those who desire wrongfully to misappropriate the substance of the invention."

See, also, Minerals Separation, Ltd. v. Hyde, 242 U.S. 261, 270, 271, 37 S.Ct. 82, 61 L.Ed. 286; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 65, 66, 43 S.Ct. 322, 67 L.Ed. 523; Smith v. Snow, 294 U.S. 1, 7, 55 S.Ct. 279, 79 L. Ed. 721. See, too, the opinion of Circuit Judge Swan (quoted above) in Franc-

Strohmenger & Cowan v. Arthur Siegman, Inc., 2 Cir., 27 F.2d 785, 786.

In the light of these observations, and the holdings in these cases, we venture the observation that the District Judge imposed too high a standard on Bodman's use of such terms as "closed", "continuous", "pressure", "plastic or semi-fluid", "texture", "characteristic" and "similar". Without attempting to discuss just what we regard as the precise connotation of each of these terms, we feel that, read in their context in Bodman's claims and specifications, these terms could be readily understood and successfully followed by experienced makers of soap.

Germane, here, is Bodman's uncontradicted testimony (quoted above) that ordinary workmen in soap found no difficulty in understanding and following these terms used in his claims. We cannot expect in a soap-process patent (and it would be unreasonable to require) terms with the precise exactitude and the clear cut accuracy found in the nomenclature of pure mathematics. We are dealing with a practical, present field of industry, not with a visionary far-off Utopia. It would be, we think, altogether unreasonable to require strictly that Bodman describe his process only in words with a keen, razor-like connotation.

Bodman may have lacked a full appreciation of "beta" and "omega" soaps; he may not have completely known, in all their devious ramifications, the theories of "phase" and "critical temperatures" of soaps. The words he used in describing his invention may not have invoked the unqualified praise of the scientific semanticist. But it is our considered opinion that he did develop a novel and important process for controlling the properties of soap by mechanical treatment rather than by chemical changes and formulae, that he was at least "boldly empirical", and that he proclaimed his invention in such form and fashion that those skilled in the gentle soapmaking art would have little or no difficulty in either understanding his process or in putting this process into practical effect.

### (b) The Prior Art.

In Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7, 8, 55 S.Ct. 928, 931, 79 L. Ed. 163, Mr. Justice Cardozo strikingly said: " * * * Sometimes it is said that in a suit for infringement, when the defense is a prior invention, 'the burden of proof to make good this defense' is 'upon the party setting it up,' and 'every reasonable doubt should be resolved against him.' * * * Again it is said that 'the presumption of the validity of the patent is such that the defense of invention by another must be established by the clearest proof—perhaps beyond reasonable doubt.' * * * Through all the verbal variances, however, there runs this common core of thought and truth, that one otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance."

See, also, Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed 983. We think that Procter failed to meet this "heavy burden of persuasion."

In discussing this subject, the District Judge cited no previous patents, cited only one extract from the prior literature and discussed only one previous soap, the Colgate Shaving Stick.

The Hilditch publication needs little comment. Practically all it discloses is that a milled and plodded soap may be violently agitated or injected with air after being brought into a warm pasty condition and then allowed to cool and set in moulds with the result that the soap would float. There was nothing new in this. A mere statement of the Hilditch disclosure is sufficient to show how very far it falls short of the Bodman process. We think the Hilditch statement assumed importance in the District Court in connection with the testimony (based largely upon secret ex parte tests) of Procter's expert, Ferguson. This testimony was in direct conflict with that of Marceau. As Circuit Judge Lacombe said in Badische Anilin & Soda Fabrik v. Kalle & Cò., 2 Cir., 104 F. 802, 808:

" * * * The 'description in a printed publication' of the statute is to be found within the four corners of such printed publication. Judge Coxe tersely and accurately expresses the law and the reason for it in the following passage:

" 'The question is, what does the prior publication say? not what it might have said, or what it should have said. If prior patents and publications can be reconstructed by extrinsic evidence to fit the exigencies of the case, the inquiry will no

longer be confined to what the publication communicates to the public, but it will be transferred to an endeavor to ascertain what its author intended to communicate.'"

See, also, Tilghman v. Procter, 102 U.S. 707, 26 L.Ed. 279. And see Cimiotti Unhairing Co. v. Comstock Unhairing Co., C. C., 115 F. 524, where Judge Coxe stated: "A document so obscure in its terminology that two conflicting theories may be deduced therefrom and supported by equally plausible arguments is too indefinite to be utilized as an anticipation."

Of all the prior soaps brought forward by Procter (and their number is legion), the District Court saw fit to consider only one, the Colgate Shaving Stick. Dr. Ittner, Colgate's expert, testified that some of the sticks floated, some did not; and the District Judge observed "there was no occasion to make the soap in the shaving stick a floating soap." We can take judicial notice of the fact that very few men shave in swimming-pools or bath-tubs. There was evidence that the floating toilet soap made by Colgate was very distinctly of the framed soap type. Testimony, too, tended to show that the Colgate Shaving Stick was made of compacted soap pellets and that it contained the laminations so typical of milled soap, which the Bodman process was designed to eliminate. All this lends little credence to the contention that this shaving stick was in anticipation of Bodman's patent.

It is not without significance that if Bodman's process and soap be anticipated in the prior art, no soap maker, in a field that promised great commercial success, seems either to have used such a process or to have developed that type of soap before Bodman applied for his patent. Procter had accomplished little along these lines, with all its vast economic resources and its elaborate research staff. In the light of the evidence in this case on the allegedly reprehensible conduct of Procter, when Procter became almost feverishly active after the applications for the Bodman and Pease patents were filed, and after the time of the allegedly surreptitious obtaining of specimens of Bodman's soap, the question might well be put whether even the long arm of coincidence could be presumed to have so extended a reach.

The District Judge held: "The prior art does not show any full anticipation either in literature, patents or uses of the particular discovery by Bodman." With

this we agree. In the next sentence, the opinion below stated: "But it (the prior art) does show that there was no novelty in the method or process used by Bodman in making the discovery." With this we cannot agree. ·Its force is greatly weakened by statements in the opinion that there was lacking in the prior art the element of pressure, the element of definite control of product quality by the selection of temperatures and "possibly the closed chamber".

We advert briefly to the contentions in the brief of Procter on the prior art. This discussion is subject to the colloquial criticism that "it shoots out of a shovel." It lacks dynamic directness; it abounds in tangential objections. The many processes therein outlined show few, if any, advances in the soap-making art; the brands of soap indicated were quite conventional with exceedingly little to suggest even the possibility of a process such as Bodman's. More strikingly is this true of the prior literature (apart from the Hilditch publication), which the District Court evidently thought was not of sufficient importance to require even comment. We certainly cannot hold that the placing of a lid on the old-time "crutcher" made it a "closed chamber" (as Bodman used this term).

4. Alleged Improper Conduct of Procter.

■ The District Court adverted to evidence tending to show certain improper conduct on the part of Procter. Counsel for Procter, in their brief, attempt to brush it aside on two grounds: (1) the charges are untrue; (2) "If overzealous employees of the defendants did certain things which should not have been done, the remedy for their misconduct should not be found in this patent case". True it is that these charges, even if sustained, have no effect on the validity of the Bodman patent. We think, however, that they are of no little importance on the question of infringement, though we must, as the District Judge pointed out, be careful lest they "put out of focus the correct legal point of view."

There was positive testimony by one Toner, an employee of Lever, that, under a bribe by one Lamping, Procter's employe, he obtained from Lever's Research Department experimental cakes of the new Bodman soap and delivered them to Lamping. Lamping, when questioned about these transactions, refused to answer (on advice of counsel) upon the privilege

642

against self-incrimination. A like course of conduct was pursued by Smelser, Procter's Director of Market Research. The testimony of Mills, an important official of Procter, and the testimony of Mr. Deupree, President of Procter, as to the conversation with Mr. Countway, President of Lever, in January, 1938, were shifty and evasive. Mr. Countway testified positively as to this conversation and made it the subject of correspondence with a business associate. According to Mr. Countway, Mr. Deupree was quite disturbed over the idea that Lever would put a soap on the market to compete with Old Ivory Soap, and Mr. Deupree admitted that, as early as December, 1937, Procter had procured sample cakes of the new Bodman soap.

The application under the Pease patent for a soap making machine referred expressly to the Bodman application, then pending in the Patent Office. The Pease patent was assigned to Lever. Richardson, Associate Director of Procter's Chemical Research Division, admitted that he learned of the Pease patent late in 1936, that "he examined it with great interest" and "The suspicion (that Lever planned to bring out on the market a new floating toilet soap) may or may not have begun with the Pease patent, that was an important factor in my whole thinking about Lever's purpose." One of Lever's exhibits was a sketch in the handwriting of Mills, dated December 20, 1937, entitled "Low Moisture Floating Soap of Fine Texture", which contained a summary of many of the qualities of soap and many of the results claimed by Bodman. There was testimony that shortly after the date of the Mills memorandum, Procter issued orders for new apparatus. And it is not denied that the New Ivory Soap was placed on sale in March, 1940, about ten months before Lever's Swan Soap went on the market.

No striking improvement had been made in Old Ivory Soap, in order to give it an appreciable number of the advantages of milled soap, for a number of years. On April 2, 1940, Procter obtained (as assignee of Eagen, an employee of its Research Department) a patent for "a milled toilet soap which will float in water". Eagen's big idea was to create a cavity in a bar of milled soap which would cause the bar to float. The Eagen soap was a commercial flop, because wear and use would expose the cavity and the bar of soap would promptly sink. The Eagen patent discoursed quite eloquently on the advantages of a milled type of floating toilet soap.

Under these circumstances, we hardly think it is passing strange that counsel for Lever contend that Procter deliberately embarked upon a course of what has been called "imperfect infringement", under which an attempt is made to pilfer many of the essential features of a patent, in the hope that the pilferer may avoid the legal consequences of his deplorable conduct on the ground that either the pilfered patent may be adjudged invalid or that the imperfect copying may be declared as lacking in infringement.

## 5. Infringement.

If the Bodman patent be interpreted as broadly as we have interpreted it, we think the patent was clearly infringed by Procter. Since the District Court (as we have indicated) gave to this patent a more restricted scope than we have given, much that was said by the District Court on this subject loses a great deal of its importance and relevancy.

Lever, under the patent, uses a machine known as a converter, the Procter machine is designated as a votator. Both machines are "adapted to operate continuously", and the Bodman patent teaches the use of such a machine in lieu of a "batch" machine such as the Banbury mixer. We think the votator is within the principle of the Bodman patent. Particularly is this true if the problem be treated (as we think it should) from the standpoint of essential function, and if we disregard minor and inconsequential differences in mechanical structure.

The District Court reaches the conclusion that the votator is not a "closed chamber" or "chamber closed to the atmosphere". Bodman also used the term "apparatus adapted to operate continuously". On this point, the court adopted the view of Dr. Andrews, a distinguished chemist, and denied that the votator is in effect closed by the soap going in at one end and going out at the other. We cannot agree with Dr. Andrews. We think he testified as a scientist, not as a soap-maker. Though he mentioned the word "functional", probably the real emphasis was on his statement that he approached the question from the view point of thermodynamics.

The very idea of a machine for continuous operation necessarily involves an inlet for intrusion, and an outlet for extrusion, of the soap stock. The primary purpose of the "closed chamber" is to keep the soap under pressure, which facilitates the required mauling, retains the air and prevents the evaporation of both perfumes and moisture. With an inlet pressure of sixty pounds, and with an outlet small enough to resist extrusion, substantially, the votator effectively performs the primary functions of a "closed chamber". Thus, the votator is a "closed chamber" within the meaning of the Bodman patent.

It is not without significance that a not inconsiderable portion of the soap extracted from the votator ran to temperatures at or above 160°. Instructions were transmitted from Procter's home office to the factory manager to throw back or work over any soap extruded at or above this precise temperature. The factory manager knew of no reason for this order. In Claim 5 of the Bodman patent the lower part of the temperature range was given as "about 160° F."

The parallel between the Bodman and Procter processes verges very much on the deadly. Both processes substantially involve steps and conditions that are essentially similar. In the Procter process, we find: (1) a moisture content of less than 25%; (2) a closed mixing chamber, as we have just interpreted this term; (3) working the mixture, while pressure is maintained, in the presence of air; (4) at a temperature within, or very closely approximating, the Bodman range, or at least at a temperature high enough to keep the mixture in a "plastic" condition (as the term "plastic" is used in Bodman's Claim 7); (5) a distribution of air that is uniform.

The infringement is made none the less real by virtue of minor and immaterial differences between the Bodman and Procter processes. Such a difference, for example, is the fact that Lever's Swan Soap is intruded into the machine in the form of soft pellets and the temperature is raised to the point desired, while Procter's New Ivory is put into the machine while hot and then cooled down to the temperature that is desired. See Smith v. Snow, 294 U.S. 1, 20, 55 S.Ct. 279, 287, 79 L.Ed. 721, where Mr. Justice (now Chief Justice) Stone succinctly stated: "Respondents do not avoid infringement of the method by varying the details of the apparatus by which they make use of it." See, also, Hartford Empire Co. v. Swindell Bros., 4 Cir., 99 F.2d 61, 62. Incidentally, Bodman adverted to both of these methods in his patent.

We hold, then, that Claim 5 and Claim 7 of the Bodman patent are valid and are infringed by the process of Procter.

## 6. The Product Claims of the Bodman Patent.

We do not think it is necessary to discuss or decide the question of the validity of the product claims of the Bodman patent, Claim 13 and Claim 20, and the question of the infringement of these two claims by Procter. Under these claims, the product is described, to a great extent, in terms of the process. Again, as we have previously pointed out, counsel for Lever, on the opening page of their brief, state: "As the product claims are closely interwoven with the process, it is enough for the purposes of this appeal to discuss the process."

## 7. Summary.

In brief summary, we decide that Claim 5 and Claim 7 (the process claims), of the patent in suit, as we have interpreted them, are valid, since they constitute a disclosure that satisfies the requirements of 35 U.S.C.A. §§ 31, 33, and since they are not anticipated in the prior art. We hold, further, that these claims, so interpreted, were infringed by the defendant, Procter.

Accordingly, the judgment of the District Court is reversed and the case is remanded to that court for further proceedings consistent with this opinion.

Reversed and remanded.