### HUTZLER BROS. CO. et al. v. SALES AF-FILIATES, Inc. (SCHERING CORPO-RATION, Intervener).

### No. 5627.

Circuit Court of Appeals, Fourth Circuit.

Nov. 10, 1947.

land L. Chapman, Raymond S. Clark, and Venable, Baetjer & Howard, all of New York City, on the brief), for appellants.

George B. Finnegan, Jr., of New York City (Hobart N. Durham and James J. Dwyer, both of New York City, R. Dorsey Watkins, of Baltimore, Md., Robert W. Byerly and Ralph M. Watson, both of New York City, and Gaylord Lee Clark, of Baltimore, Md., on the brief), for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is a civil action, filed in the United States District Court for the District of Maryland, alleging infringement of the Evans and McDonough patent, No. 2,352,-524, issued June 27, 1944, on application filed June 20, 1938. Of the claims in suit, the District Court held that claims 2, 11, 12 and 13 were valid and that claims 6 and 17 were invalid. Plaintiffs thereupon disclaimed claims 6 and 17 along with claim 7, which was not in suit. The District Court held that these valid claims were infringed by the defendants and decreed an injunction and a reference to a master for the determination of the damages and profits to which plaintiffs may be entitled. The District Court's elaborate opinion will be found in 71 F.Supp. 287, 291. Defendants have duly appealed.

The patent in suit covers a depilatory, a chemical composition for the removal of hair from living human skin. IMRA was the product marketed under this patent; the products held to be infringing were marketed under the names of SLEEK and NAIR. No serious contention was made by defendants that their products did not infringe the patent in suit and infringement was practically conceded. Defendants, however, contest the validity of the patent in suit. We are, therefore, concerned only with the validity of the claims (Nos. 2, 11, 12 and 13) which the District Court held to be valid.

Claims Nos. 2 and 13 are typical, so they are set out in full:

"2. A depilatory for use in removing human hair from the body, comprising a creamy preparation containing a substantial amount of a creamy non-depilating vehicle

Worthington Campbell, of New York City (Campbell, Brumbaugh & Free, Le-

carrying thioglycollic acid, and an excess of an alkaline reacting material, said creamy preparation being adapted to be spread upon the human skin and around the hair, the amount of thioglycollic acid being sufficient to render the hair removable after contact therewith within a short time and without irritation to the skin, and the alkaline reacting material being present in an amount sufficient to give the preparation a pH value between about 10 and 12.5."

"13. A depilatory for use in removing human hair from the body, comprising a creamy preparation containing a substantial amount of a creamy non-depilating vehicle carrying a substituted mercaptan and an excess of a non-volatile alkaline reacting material having a dissociation constant greater than 2.0 x 10-5, said creamy preparation being adapted to be spread upon the human skin and around the hair, the amount of substituted mercaptan being not less than 0.1 mole per liter of solution to effect removal of the hair after contact therewith within a short time and without irritation to the skin, and the alkaline reacting material being present in an amount not greater than twice the acidic equivalents of said mercaptan, and sufficient to give the preparation a pH value between 9 and about 12.5."

The District Court (we think quite accurately) broke claim 2 down into:

"* * * the six following things: (1) A substantial amount of a creamy non-depilating vehicle; (2) carrying thioglycollic acid (which is also known as mercapto-acetic acid); (3) an excess of an alkaline reacting material; (4) this creamy preparation being adapted for spreading upon the human skin and around the hair; (5) the amount of thioglycollic acid being sufficient to render the hair removable after contact therewith within a short time and without irritation to the skin; and (6) the alkaline reacting material being present in an amount sufficient to give the preparation a pH value between about 10 and 12.5."

In other words, the composition described in the claims embraced two depilating ingredients: the substituted mercaptan (thioglycollic acid) and an alkaline reacting material such as lime; a non-reactive paste-forming ingredient; and a perfume material, 1% or less of light floral odors.

Human depilatories had, of course, been known and used long before the Evans and McDonough patent. These prior depilatories were nearly all alkaline compounds of inorganic sulfides. They were effective in removing hair from the human skin, but they had one serious disadvantage. This was the emanation of hydrogen sulfide gas, with the very objectionable odor of rotten eggs. This permeating odor would cling to the body and pervade the whole room in which such depilatories were used. Hydrogen sulfide is highly noxious; it tarnishes jewelry and damages many objects with which it is brought into contact; also, any product in which hydrogen sulfide is used, tends to take on an unpleasant greenish color. Attempts were made to eliminate or suppress the disagreeable odor by increasing the causticity of the composition, but this served to cause skin irritation and burns. It was proved that so objectionable were those sulfide depilatories that many fashion magazines (such as "Vogue" and "Harper's Bazaar") refused to carry their advertisements, while a number of high class department stores (such as Saks-Fifth Avenue, Bonwit-Teller and Marshall Field) declined to offer them for sale.

A basic difference between the patent in suit and previously used depilatories is found in the replacement of mercaptans for sulfides, especially substituted mercaptans (thioglycollic acid, in particular) as distinguished from simple mercaptans. A mercaptan is an organic compound, a sulfhydrate of a hydro carbon. In a simple mercaptan, which stems from an alcohol, one hydrogen sulfide group replaces the hydroxyl group. In a substituted mercaptan, some other atom, or groups of atoms, replace one or more hydrogen atoms. Substituted mercaptans may again be divided into a polar group which ionizes in solution, and a non-polar group which does not so ionize.

The mercaptan serves to weaken the keratin, the horny substance of which hair is composed; while the alkaline reacting material operates then to remove the hair which has been weakened by the mercaptan. In the patent in suit, the mercaptans serve the same purpose as the sulfides in previously known depilatories. The symbol pH, followed by a number, is used to denote the

precise degree of alkalinity of a composition. The higher the pH, the more effective the depilatory, and the greater is the irritation to the skin. Thus, in a successful depilatory, the pH must be high enough to depilate, yet low enough to be within the tolerance of the human skin.

The first attack of defendants upon the validity of the claims of the patent in suit which the District Court held to be valid is that these claims are indefinite and are couched in merely functional terms. Accordingly, it is urged, these claims fail to live up to the requirements of § 33 of 35 U.S.C.A. which provides, in part, that the description of the invention or discovery must be

"* * * in such full, clear, concise, and exact terms, as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; * * * and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery."

As did the District Judge, we find no merit in this contention, and we think it unnecessary to add much to what was said in the District Judge's opinion.

■ It is elementary in patent law that the invention is measured in terms of the claims, but that the claims are to be read, interpreted and applied in the light of the specifications, which may not enlarge a claim but which may explain and clarify it. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132; General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910. And, as our Court said in Lever Bros. Co. v. Procter & Gamble Mfg. Co., 4 Cir., 139 F.2d 633, 639:

"The words of Bodman's specifications and claims must be judged in the light of the vocabulary available to a soap maker."

■ Thus defendants attack in the claims the words "the alkaline reacting material being present in an amount sufficient to give the preparation a pH value between about 10 and 12.5." We think that any competent chemist versed in the cosmetic art, would easily know how to add sufficient alkaline material to give the desired pH value. Defendants object, further, to such expressions as "render the hair removable", "without irritation to the skin", "in a short time." The District Judge, at some length, showed how definite and complete were the specifications explaining and concretely applying the seemingly indefinite terms of the claims. His conclusion here seems to be in complete agreement with recent cases decided by our Court. Lever Bros. Co. v. Procter & Gamble Mfg. Co., 4 Cir., 139 F.2d 633, 638; Procter & Gamble Mfg. Co. v. Refining, Inc., 4 Cir., 135 F.2d 900, 906; Nichols v. Minnesota Mining & Manufacturing Co., 4 Cir., 109 F.2d 162, 165; Commercial Novelty Co. v. Victory Fireworks & Specialty Co., 4 Cir., 92 F.2d 299, 300; Demco v. Doughnut Machine Corporation, 4 Cir., 62 F.2d 23, 25.

■ We come next to the most difficult question in this case, the one most strongly urged by the defendants—namely, the presence or absence of sufficient novelty or originality in the patent in suit in the light of the prior art. There is, of course, some presumption of validity arising from the granting of the patent. This, too, is measurably strengthened by the findings of the District Court.

Little trouble is given by the Donner patent, No. 1,379,855, issued May 31, 1921, the McKee patent, No. 1,899,707, issued February 28, 1933, and the Stoddard patent, No. 2,123,214 issued July 12, 1938. The Donner and Stoddard patents were thoroughly considered by the Examiner in the prosecution of the application of Evans and McDonough.

In Donner, the depilating agent is a sulfide, without even a suggestion of a mercaptan as used in the patent in suit. Donner had all the defects of a sulfide depilatory, which Evans and McDonough set out to avoid. McKee and Stoddard used, as a depilating agent, sodium stannite, a tin salt which has a tendency to rapid decomposition. These two patents clearly reflected an advance over Donner, but again no suggestion of a mercaptan was made, and the field of these two patents is a far cry from Evans and McDonough.

Next we consider two articles: "Effect of Sulfides in the Alkaline Hydrolysis of Skin and Hair," by Merrill, published in January, 1925, and "A Study on Keratin," by Goddard and Michaelis, published in May, 1934. Something of the scope of these articles may be gleaned from their titles. Merrill confined his discussion solely to sulfides, with no mention of mercaptans, and his experimentation was confined to the hair and skin of animals. In the article of Goddard and Michaelis mention is made that thioglycollic acid, among a list of a number of other chemicals including sulfides, may be employed on sheep wool and chicken feathers as a reducing agent of keratin. No distinction between simple and substituted mercaptans was suggested, thioglycollic acid apparently being put in the same class as the malodorous sulfides.

Very strong reliance is put by the defendants on the Turley patent, No. 1,973,-130, issued in September, 1934. Certainly this patent is much closer to Evans and McDonough than the patents of Donner, McKee and Stoddard. Defendants maintain vigorously that the patent in suit discloses no patentable novelty over Turley, that all Evans and McDonough really did was to discover a new use for Turley's process. And, it is well settled that a new use for an old process or product is not in itself patentable. In Old Town Ribbon & Carbon Co. v. Columbia Ribbon & Carbon Mfg. Co., 2 Cir., 159 F.2d 379, 382, Judge Learned Hand said:

"All the mental factors which determine invention may have been present to the highest degree, but it will not be patentable because it will not be within the terms of the statute. This is the doctrine that a 'new use' can never be patentable."

See, also, General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 249, 66 S.Ct. 81, 90 L.Ed. 43; Corona Cord Tire Co. v. Dovan Chemical Corporation, 276 U.S. 358, 369, 48 S.Ct. 380, 72 L.Ed. 610; Blake v. San Francisco, 113 U.S. 679, 682, 5 S.Ct. 692, 28 L.Ed. 1070.

Indeed, defendants go even further and in the brief filed with us they contend: "the *compositions* of Turley and of Evans are the *same* and are used for the *same* purpose, namely, the removal of the hair of mammals * * *. Since the hair of all mammals is composed of keratin, no different use is made of the Turley composition when it is employed to remove hair from a human being." On the other hand, plaintiffs, in their brief, contend: "Turley teaches nothing which would help those skilled in the art to improve cosmetic depilatories and that the objects Turley sought to accomplish are radically opposed to those of Evans and McDonough." The Turley patent, apparently, was the principal reference considered by the Patent Office Examiner in connection with the patent in suit. Commercial Novelty Co. v. Victory Fireworks & Specialty Co., 4 Cir., 92 F.2d 299; Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 4 Cir., 35 F.2d 433. The District Judge, in his opinion, discussed the Turley patent at great length.

Turley designates his patent as "a process of unhairing hides or skins." And, in his specifications, his patent is thus described:

"This invention relates to a process of unhairing hides or skins by the use of mercaptans or those organic compounds containing or yielding a mercaptan or thiol group (-SH) when employed with alkaline solutions such as now used for the removal of hair, fur or wool.

"The object of our invention is to complete the process of unhairing hides or skins in a shorter time than is ordinarily necessary and yet accomplish the unhairing process without creating or leaving any deleterious effect upon the hide or skin and with or without hair recovery depending upon the amount and nature of the above compounds."

Judge Coleman, below, found no difficulty in distinguishing the unhairing of the hides of dead animals and the depilation of living, human skin. In his opinion (rather aptly, we think) he stated:

"In unhairing, the hair is saved, or can be, and the epidermis is destroyed. In cosmetic depilation the hair is chemically severed at the very surface of the epidermis but the tenderest or most delicate skin is not even irritated or reddened. In unhairing, the entire flayed hide is wholly immersed in a liquid bath for several hours or even days. In cosmetic depilation, small areas of the living human skin are lightly coated during

a period of from five to fifteen minutes with a fragrant cream which is wiped off as soon as the hair is severed. In unhairing, the liquid solution is always applied to and soaks through the derma from the flesh side, and usually through immersion is applied to both flesh and outer or hair sides simultaneously. In cosmetic depilation, the depilating compound is always applied on the hair side only and it never penetrates into or below the epidermal layer. In unhairing, the odor of such compounds as may be used is unimportant, as is also the optimum of alkalinity from the aspect of irritation of the skin. In a cosmetic depilatory, both pleasant odor and the optimum of alkalinity to avoid irritation are all-important."

And we quote the District Judge's final paragraph of his summary of the precise relations (as he saw them) between Turley, on the one hand, and Evans and McDonough, on the other:

"It is true that some of the above groups taught by Turley would include substituted mercaptans; and, in fact, group (2) specifically indicates thioglycollic acid. But the invention of Evans and McDonough lies in their discovery (a) that mercaptans in general can be divided, for *depilating* purposes, into a classification different from that prescribed by Turley for unhairing, namely into *simple mercaptans* and *substituted mercaptans*, the substituted mercaptans being further divisible into polar groups and non-polar groups; and (b) that *substituted mercaptans*, especially when in polar groups, are chemicals that can be adapted to the depilatory art where commercial requirements are totally different from those of the unhairing art, in that (1) a depilatory must be applied to the exterior surface of living and delicate skin; (2) the depilation must be rapid; (3) there must be no odor; and (4) a depilatory must be in the form of a cream which can be conveniently applied. In other words, we are satisfied that Evans and McDonough did display what, as we have seen, the Supreme Court termed 'the flash of creative genius,' not merely the skill of the calling, when they conceived a class of mercaptans which would not only 'unhair'— because Turley taught that—but which could be adapted to the depilatory art and thus be used on human skin where all of the

very definite requirements of non-irritability, quick and thorough depilation and freedom from all objectional odor and color had not yet been successfully combined in one compound. Thus, while defendants' testimony which we have analyzed does show that certain formulas of Turley, *when read in the light of Evans and McDonough*, actually produce the result of Evans and McDonough when substitued mercaptans *suggested* by Turley are used, nevertheless, it remained for Evans and McDonough to seize upon that particular class of mercaptans which could be combined with other elements, in stipulated proportions, so as to meet the needs of the depilatory art."

The Turley process is one of complete immersion for several hours or even days, utterly unadaptable for a human depilatory. Nowhere in Turley's claims or specifications is there any pH limit, which is readily understandable, since there is no problem of irritation in connection with dead animal hides as there is with the human skin. Nor is there any reference in Turley's claims or specifications to a creamy material or a non-depilating vehicle. On the contrary, the composition is a non-homogeneous slurry, of a loose and watery character, which, on standing, has a tendency to settle and cake. It accordingly, could not be localized for use as a human depilatory, and if an attempt is made to subject it to such use, it is quite incapable of protecting the mercaptans from oxidation.

 We are not deeply impressed by the experiments made by the defendants' expert, Doctor Killian, in an endeavor to show how easily Turley's composition could be adapted to use as a human depilatory. It seems more than probable, in many of these experiments, that material changes were made in the examples outlined by Turley by working backwards from the patent in suit. Defendants did not either offer in evidence or show to the court any of these "Turley compositions" made up by Dr. Killian. Ex parte tests made solely for the purposes of litigation in patent cases have been given only negligible probative value by the courts.

Quite germane here are the words of Judge Lindley in Donner v. Walgreen Co., D.C., 44 F.2d 637, 642:

"Defendant introduced the testimony of certain experts who made experiments ex parte. Unfortunately the strict teachings of the formulæ and the Donner Patent were not followed, and there is little to enlighten the court, therefore, in the testimony as to the same. The courts place little weight on ex parte demonstrations in any case, but especially is this true with regard to experiments with chemicals."

Even better known is the statement of Mr. Justice McKenna in Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527:

"Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration."

See, also, Carson v. American Smelting & Refining Co., 9 Cir., 4 F.2d 463, 465.

Once more we quote Judge Learned Hand, this time in Regar & Sons v. Scott & Williams, 2 Cir., 63 F.2d 229, 231:

"* * * When old devices are changed at all, the change may be dictated by a new conception, which it took originality to conceive. Strictly, the old device is not then put to a new use; the new use begets a new device. In such cases it requires but little physical change to make an invention."

And see Potts v. Creager, 155 U.S. 597, 608, 15 S.Ct. 194, 39 L.Ed. 275; Victor Cooler Door Co. v. Jamison Cold Storage Door Co., 4 Cir., 44 F.2d 288, 294; Tate v. Baltimore & Ohio R. Co., 4 Cir., 229 F. 141.

We must, therefore, conclude that Turley did not anticipate Evans and McDonough. Turley discloses nothing to indicate that he even conceived the possibility of producing an effective and odorless depilatory which would sever hair at the surface of the living skin of humans. McDonough and Evans did far more than find a new use for Turley's composition; by lengthy experimentation they discovered and perfected a new combination that went well beyond any cosmetic depilatory hitherto known to this highly specialized art. And, finally in this connection, it might be noted that Turley is virtually a paper patent, since it has never been successfully used in commerce.

This brings us to the French patent, No. 824,804 granted to Fletcher. Its issue date, or delivré, is November 18, 1937, and it thus is clearly prior to the Evans and McDonough patent, granted June 27, 1944, on application filed June 20, 1938. While plaintiffs in their brief state: "The French patent (granted to Fletcher) does not contain everything which is found in the specification of the patent in suit," this contention is not seriously urged upon us. We must agree with the finding of the District Judge:

"Plaintiff concedes that this French patent, *considered by itself,* independently of the testimony which plaintiff introduced with respect to the actual date when Evans and McDonough first discovered and successfully applied the formula embraced in their patent, clearly anticipates Evans and McDonough."

Plaintiffs, therefore, must rest upon the District Court's further finding:

"* * * we believe that the testimony introduced on behalf of the plaintiff must be accepted as clearly establishing the fact that Evans and McDonough did actually make their discovery as early as March 11, 1937, and therefore, that they were not anticipated by Fletcher, the earliest date which, as conceded, may be applied to Fletcher being November 18, 1937."

We think this finding must be upheld by us on the grounds that it finds ample support in the evidence and is not clearly erroneous.

Plaintiff introduced the oral evidence of McDonough, and portions of McDonough's laboratory note-book, to show that as early as February, 1936, the patentees had made and successfully used a depilating composition consisting of a non-reactive creamy vehicle containing thioglycollic acid and lime in sufficient quantity to give the composition a pH value of 12.3, which thus an-

ticipated every essential element of the Fletcher patent. The District Court, however, was not convinced by this evidence that, "at the earlier time, either Evans or McDonough actually discovered what was the optimum of alkalinity for depilation purposes." Be that as it may, this evidence has cumulative effect, fits well into the picture and, with the other evidence, tends to confirm the court's finding that Evans and McDonough had completed their discovery as early as March 11, 1937.

The District Court was, as to the last mentioned date, deeply and properly impressed by the oral testimony of Dennis, McDonough's laboratory assistant, and by the written laboratory note-books which were introduced in evidence. Defendants, of course, have attacked this evidence. We agree, however, with the District Court that these attacks are captious and lacking in merit. There is ample ground, when all of plaintiffs' evidence is viewed as a whole, to warrant the District Court's finding that by March, 1937, McDonough had discovered and perfected an effective depilatory, compounded as he subsequently described in the claims of the patent in suit.

There are a number of other points in this case. Some of them deserve brief mention; they do not require extended discussion.

We cannot attach, as defendants seem to suggest, any ulterior motives, or any improper conduct, to plaintiffs in connection with the agreed settlement with Bohemen in the interference proceedings. Had the interference proceedings been prosecuted to final judgment, this would have unquestionably delayed the granting of the patent in suit. There were ample business reasons for a friendly settlement. And there was evidence to show that this settlement was recommended by Bohemen's attorney after a review of the proofs of the priority of Evans and McDonough.

We are not impressed by the suggestion of defendants that the patent in suit should be declared invalid under 35 U.S.C.A. §

88 because of asserted laches of plaintiffs in applying for correction of certain claims. Nor can we draw, as defendants contend we should do, the suggested inferences from the file wrapper of the Evans and McDonough abandoned application, filed October 8, 1937.

We cannot, either, predicate any effective estoppel against the patentees, upon the assertion that this patent was granted by the Patent Office Examiner upon a mistaken view that the optimum of alkalinity constituted the sole novelty of the patent in suit over the prior art and that this position was accepted by Evans and McDonough. The claims allowed, involving a new combination, went far beyond this and the patentees are not limited by the mental processes, or confined to the precise reasoning, of the Examiner. See Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805; France Manufacturing Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605; International Cellucotton Products Co. v. Sterilek Co., 2 Cir., 94 F.2d 10; Egry Register Co. v. Standard Register Co., 6 Cir., 267 F. 186.

The commercial success of IMRA, made under the patent in suit, was established by clear and uncontradicted evidence. And there is unquestioned force in the District Court's suggestion that commercial success is a factor of probative value on the question, in close cases, whether a patent actually involves novelty and invention. Said Mr. Justice Stone in Smith v. Hall, 301 U.S. 216, 233, 57 S.Ct. 711, 718, 81 L.Ed. 1049: "Commercial success may turn the scale when invention is in doubt." See, also Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973; Paramount Publix Corporation v. American Tri-Ergon Corporation, 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997; McClain v. Ortmayer, 141 U.S. 419, 428, 12 S.Ct. 76, 35 L.Ed. 800.

The judgment of the District Court is affirmed.

Affirmed.